## Case No. 514.

ARELL'S REPRESENTATIVES v. MAR-STELLER et al.

[2 Cranch, C. C. 11.][1]

Circuit Court, District of Columbia. Nov. Term, 1810.

ARESTA, (FONTAINE v.) See Case No. 4,-905.

AREY, (MERRILL v.) See Case No. 9,468.

## Case No. 515.

The ARGO.

[7 Ben. 304][2]

District Court, S. D. New York. May, 1874.

SEAMAN'S WAGES—JURISDICTION—STALE-CLAIM NOTES.

1. A pilot was employed on a steamboat in the harbor of New York during several months in 1872 and several in 1873. The owners gave him notes for part of the amount, which notes were not paid. In April, 1874, he filed a libel against the boat. She had in the mean time been sold at sheriff's sale, and had been again sold to H., who had no knowledge of this claim, but had been told that the men on the boat had claims: *Held,* that the libellant's claim was not stale, and that he was entitled to a decree for his wages on his depositing the notes, properly endorsed, with the clerk, for the use of the claimant.

2. A vessel in a basin at Jersey City, which communicates directly with the Hudson river, lying at some piles about 40 feet from the dock, is subject to the process of the United States district court for the southern district of New York.

[Cited in The L. W. Eaton, Case No. 8,612; Kiernan v. The Norma, 32 Fed. 411.]

In admiralty. This was an action brought by Willett Martin, to recover wages for services on board the steamboat Argo, as pilot, from April 17th, 1872, to October 9th, 1872, and from June 21st, 1873, to October 14th, 1873. The libel was filed April 11th, 1874. It alleges the services performed, and the amount due, and that the owners had given him two notes therefor, which were unpaid, and which the libellant offered to surrender. The claimant, A. H. Harris, set up in answer, that the steamboat was not within the jurisdiction of the court, when she was attached under the process, and that he had bought the steamboat since the libellant's claim accrued, and without knowledge of such claim. It appeared, that the vessel, when attached under the process, was lying in what is called the Morris Canal Basin, at Jersey City, made fast to piles driven into the bottom, and about 40 feet from the side of the dock, and that the basin communicated directly with the waters of the Hudson river. Harris bought the vessel in February, 1874, from one Silbers, who bought her from a purchaser of her at a sheriff's sale. Harris bought without knowledge of the libellant's claim, but was told by Silbers that the men on the boat had claims. The libellant lived at South Amboy, N. J. and had been ill during the previous winter.

W. J. Haskett, for libellant.
H. Wallis, for claimant.

## Case No. 516.

The ARGO.

[1 Gall. 150.][1]

Circuit Court, D. Massachusetts. May Term, 1812.

PRIZE—CONDEMNATION — VIOLATION OF EMBARGO ACT—EXCUSES—NECESSITY.

1. The 3d section of the embargo act of the 9th January, 1808, c. 8, was not repealed by the act of the 1st March, 1809, c. 91.
2. Of the kind of necessity which excuses from forfeiture; condemnation on the facts.

[Disapproved in The Ella Warley, Case No. 4,873.]

[1][Reported by Hon. William Cranch, Chief Judge.]
[2][Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

[1][Reported by John Gallison, Esq.]

[3. Cited in Beals v. Hale, 4 How. (45 U. S.) 53, to the point that a second law does not repeal a former one on the same subject without a repealing clause or negative words, unless so clearly repugnant as to imply a negative.]

In admiralty.

Mr. Dutton, for claimant.

G. Blake, for the United States.

[Before STORY, Circuit Justice, and DAVIS, District Judge.]

STORY, Circuit Justice. The only count, relied upon in the information, is for a departure from the port of Boston, and proceeding on a voyage to certain foreign ports, viz. Halifax and Barbadoes, against the 3d section of the act of 9th January, 1808, c. 8. The claim admits the fact of proceeding to Halifax, but alleges, that on the 15th May, 1809, the ship departed from Boston, bound to a permitted port in the West Indies, having given bonds, and being duly cleared, according to the 13th section of the act of 1st March, 1809; that during the voyage, the ship was compelled by stress of weather and necessity, to go to Halifax, where she arrived the 29th of the same month; that by virtue of the president's proclamation of 19th April, 1809, her subsequent voyage to any British port became lawful after the 10th June, 1809, and she accordingly went to Barbadoes, &c. Upon the breaking of the argument, it was at first supposed, that this count was founded on the 13th section of the act of 1st March, 1809, c. 91, and it was contended, that even if the defence of necessity was not made out, (as all the other facts were admitted) the vessel would not be subject to forfeiture, as the only remedy, under that section, was on the bond given on the departure of the ship. I lay all the argument proceeding on this ground out of the question, as the count is clearly founded on another act. It has since been argued, with great ability, that the 3d section of the act of 9th January, 1808, on which this information is founded, was repealed by the act of 1st March, 1809, c. 91, and if the argument be correct, it undoubtedly follows that this prosecution is not maintainable. In support of the argument, it has been assumed as a general position, that subsequent laws respecting the same subject matter, when repugnant to prior laws, repeal them. The propriety of this position is not disputed. The only question is, whether such actual repugnancy exists here in such a shape, as leaves no reasonable doubt of the legislative intention. For a presumed legislative intention of repeal is the ground, on which rests the maxim "leges posteriores priores contrarias abrogant."

It is exceedingly to be regretted, that the legislature have chosen to express themselves in so loose and inartificial a manner, and to leave so important a subject to mere inference and judicial construction. Yet the court cannot avoid the difficulty, and must content itself with the obscure and wavering lights, which are thinly scattered through the act. The sections of the act, which have been chiefly relied on in the argument, are the 12th, 13th, 14th, and 16th. The 12th declares, that so much of the act laying an embargo, &c. as forbids the departure of vessels owned by citizens of the United States, and the exportation of domestic and foreign merchandise to any foreign port or place, shall be repealed after the 15th of March, 1809, except so far as they relate to Great Britain and France, or their dependencies. The legal effect of this enactment, at first view, would undoubtedly seem to be, that the embargo acts were left in full force, as to Great Britain, France, and their dependencies, and were repealed as to all the rest of the world. At least, it is difficult to give any exact sense and meaning to the terms, unless this be the true construction. For there are no provisions in those acts exclusively directed against Great Britain, or France, or their dependencies. By the operation of this clause, the bonds, required in ordinary cases by the embargo law, would have been completely at an end, as to voyages to permitted ports. The 13th section therefore declares, that during the continuance of so much of the embargo acts, as is not repealed by that act, no vessel bound to a foreign port, with which commercial intercourse shall, by virtue of that act, be again permitted, shall be allowed to depart for such port, unless a bond be given, with condition, that the vessel shall not leave the port without a clearance; nor, when leaving the port, shall proceed to any port of Great Britain, France, or their dependencies, nor be directly or indirectly engaged, during the voyage, in any trade with such port, nor shall put any article on board of any other vessel. These are almost an exact copy of the prohibitory words of the 3d section of the act of 9th January, 1808, c. 8. If the act had stopped here, the whole coasting and fishing trade would have been subject to all the restrictions of the embargo acts, and therefore the 14th section expressly repeals so much of these acts, as compels vessels owned by citizens of the United States, bound to another port of the United States, or vessels licensed for the coasting trade or fisheries, &c. to give bond or to load under the inspection of the revenue officers; or so much as renders them liable to detention merely on account of the nature of their cargo, with the exception of such provisions, as relate to districts adjacent to foreign territories, or to vessels belonging to or bound to such districts. This clause would have completely relieved coasting vessels from all the restrictions of the embargo acts, but the 15th section immediately takes up the case, and provides that no vessels owned by citizens of the United States, bound to another port of the said states, or licensed for the coasting trade, shall be allowed to depart from any port

of the United States, nor shall receive a clearance, nor shall it be lawful to put on board such vessel, any specie, goods, wares, or merchandise, unless a permit shall have been previously obtained from the proper collector, &c. nor unless a bond, prescribed by the section, is given with condition, that the vessel shall not proceed to any foreign port or place, and that the cargo shall be relanded in some port of the United States.

The 16th section provides, that during the continuance of so much of the embargo acts, as are not repealed, &c., if any ship or vessel shall depart from any port of the United States, without a clearance or permit, or having given bonds in the manner provided by law, such ship or vessel, together with her cargo, shall be wholly forfeited. Much stress has been laid on this section, as containing within itself provisions applicable to the same cases, as the 3d section of the act of 9th January, 1808, and therefore that being in pari materia, the latter is repealed by the former. Certainly the clauses will not be contended to be wholly repugnant, although they may be held to apply, in some instance, to the same facts. But because the provisions of different acts may, under certain circumstances, apply to the same subject matter, it does not follow that they are to be construed as totally repugnant, unless they cannot be construed as cumulative. And where several acts exist on the same subject, the last does not repeal the former, unless it be couched in negative terms, or when its matter is so clearly repugnant, that it necessarily implies a negative. 1 Bl. Comm. 89. But I do not rely on this rule. On a careful attention to this section, I am satisfied, that it applies to the cases enumerated in the 13th and 15th sections, and none other. The words, "in the manner provided by law," seem to me to refer to the departure without a clearance or permit, as well as to the giving of bonds, in the cases stated in those sections. If this be the true construction, it avoids most, if not all of the difficulties and repugnancies, which have been so elaborately urged by the counsel for the claimants.

It is said, that the remedy intended by the legislature in cases like the present, where the vessel proceeded to an illicit port, is the forfeiture of the bond, and that when other forfeitures have been intended, express provisions have been made for this purpose. This reasoning however leaves the original question untouched; for as it was competent for the legislature to provide such forfeitures, still the inquiry returns, whether the legislature have not so expressed their will. Much has been said, as to the repugnance of the 13th section of the act, where it refers to the 2d section of the act of 9th January, 1809, c. 7, and if the present forfeiture were claimed under the latter section, it would deserve great consideration.

But all arguments derived from sources of this nature are liable to great objection, when they encounter the positive enactments of a leading section. Now if the construction contended for by the claimant be true, it will follow, that the embargo acts were repealed, not only as to foreign countries, but even as to Great Britain and France, and their dependencies. Unless the provisions of these acts remain in full force, as to those countries, it is difficult to find in any other act a prohibition of trade with either. There is no clause in the nonintercourse act of 1st March, 1809, directly inhibiting a departure for, or exportation to those countries, unless it be in the 12th section. It has indeed been ingeniously urged by the counsel for the claimant, that the exposition of the 12th section assumed by them, may well be maintained by holding, that the embargo acts are altogether repealed, as far as they impose penalties and forfeitures, and that a mere naked embargo and interdict of trade remained as to Great Britain and France, without any other vindicatory sanctions, than those contained in the 16th section. But if such had been the legislative intention, the natural course would have been to have repealed all those acts, and to have enacted a direct embargo, as to Great Britain and France. Instead of this, the legislature declare, that so much of these acts, as forbid a departure, &c., are repealed, except so far as they relate to Great Britain and France. It is not a mere naked embargo or interdict, but the acts laying and regulating it, which are to continue as to those nations. It is not simply the original act laying the embargo, (which according to the argument would alone exist in force), but all the acts supplementary to that act, which are excepted from the repealing clause.

In order therefore to effectuate the manifest intention of the legislature, as well as the words of this section, it is necessary to consider the embargo acts as remaining in full force, as to vessels bound to Great Britain, France, and their dependencies; and if in full force, surely a vessel departing from an American port, and proceeding to a prohibited port, must be within the purview of the 3d section of the act of 9th January, 1808. In this view it seems to me, that all difficulties vanish. Vessels bound to foreign permitted ports, or to our own ports, are regulated by the act of 1st March, 1809. Vessels bound to prohibited ports are restrained by the embargo acts, and these operate upon them in the same manner, as though the embargo had not originally extended beyond the prohibited countries; or in other words, the embargo acts, as to all voyages to such countries, remain in full force. When the court is called upon to reject the words of a whole section, upon inferences deduced from supposed incongruities in other sections, the case should be

too palpable to admit of doubt; and if by any reasonable construction, the whole can be reconciled, it is an indispensable duty to adopt such construction. In my judgment, the 3d section of the act, on which this information is founded, was in full force at the time of the Argo's departure. She sailed after the president's first proclamation was issued, (19th April, 1809,) but before it had had effect, (to wit, 10th June, 1809), and consequently must be condemned, unless the facts alleged in justification are fully supported.

Continued for argument on the facts.

STORY, Circuit Justice. The case has now been argued upon the facts, and the single question for the court to decide is, whether the justification set up by the claim is supported by the evidence. The claim alleges that the ship proceeded to Halifax, as stated in the information, but that it was occasioned by stress of weather, and an inevitable necessity growing out of the accidents of the voyage. I need not, after the repeated determinations of this court, state that it is a settled principle, that where the facts constituting a case of forfeiture are admitted, and a justification or excuse is alleged by the claimant, it rests on him to show such justification or excuse free from any reasonable doubt; and if he fail so to do, a decree of condemnation must prevail. It has been argued, that the necessity, which will excuse a violation of the law, need not be an overruling physical necessity, but such facts and circumstances which ought to induce a prudent master, in the exercise of the authority confided to him, to deviate for the purpose of refitting and repairs: and the case has been likened to that of a deviation under a policy of insurance. It may be admitted, that the necessity which will excuse or justify a violation of the law in cases of this nature, need not be irresistible in a physical view; but it can never be successfully argued that the facts, which will excuse a deviation in cases of insurance, will constitute an excuse for offenses committed against the public law. The cases are totally different. There is, from the nature of the contract of insurance, an implied authority to the master, to act upon emergencies, for the benefit of all parties; and if he act bona fide, and with reasonable discretion, he acts within the scope of that authority; but where the law imposes a prohibition, it is not left to the discretion of the citizen to comply or not; he is bound to do every thing in his power to avoid an infringement of it. The necessity which will excuse him for a breach, must be instant and imminent, it must be such as leaves him without hope by ordinary means to comply with the requisitions of the law. It must be such, at least, as cannot allow a different course without the greatest jeopardy to life and property. He is not permitted as in cases of insurance, to seek a

port to repair, merely because it is the most convenient, and the most for the interest of the parties concerned. He is, on the contrary, bound to seek the port of safety which first presents, if it be one where he may go without violation of the law. In a word, there must be, if not a physical, at least a moral necessity, to authorize the deviation. Under such circumstances the party acts at his peril; and if there be any negligence or want of caution, any difficulty or danger which ordinary intrepidity might resist and overcome, or any innocent course, which ordinary skill might adopt and pursue, the party cannot be held guiltless, who, under such circumstances, shelters himself behind the plea of necessity.

Now in the present case I must say, that the evidence is in no degree satisfactory, as to the existence of any necessity for the voyage to Halifax. The witnesses for the claimant, whose depositions are before the court, give testimony, which at most is loose, inaccurate and awkward. The deposition of the mate, which is mainly relied on, presents a very feeble case. The account which he gives of the storms is very mild, compared with the usual exaggerations in these cases. The wind does not appear to have been very violent; the deck load was not thrown overboard; no sails were lost, no spars sprung, no rigging injured. The leak is nowhere represented as serious, and one hand could always keep the vessel free; the tar, which is said in some degree to have choked the pumps, does not appear to have presented insurmountable obstructions. On arrival at Halifax, it is not pretended that any serious leak was discovered; the upper works were examined, and, says the mate, "the caulker was round the vessel, and I heard him caulking her, as I thought, but I did not see him drive any oakum in her, and he said he could not find any material leak in her." Yet it seems the leak, if any where, was in the upper works, for on lightening the ship it was greatly diminished. Besides, the whole deposition is essentially defective in the most important particulars. It comes from the person who usually keeps the logbook, and from whom we are entitled to expect a full and minute account of the state of the weather, the courses of the ship, the length of the gales, and the general transactions on board during the period in which the disasters are alleged to have occurred. I might add also, that the log book, a most material document, is not produced, and as it is usually called for in cases of this nature, its absence does not add to our general confidence. But independent of these objections, there are certain intrinsic difficulties in this case, from which I cannot relieve my mind. In the first place the owner was at Boston about the time of the vessel's sailing, and though she arrived at Halifax in eight days, he met her there on her arrival. No account is given of his journey thither, nor

of its object. He appears there without surprise to the captain; and a supercargo is put on board at Halifax, who accompanies the ship to the West Indies. I think it is difficult to resist the impression, that there was something like preconcert in these circumstances; at least it throws a shade over the cause which has not been attempted to be removed.

In the next place the ship run down the whole eastern coast of the United States. The winds were very favorable for her to go into any eastern port to refit, yet no effort was made for this purpose, and no reason is assigned why it was not done. Surely no master of ordinary skill could, without cause, be guilty of so gross a misbehavior, as not to make a port in the United States, when so many lay in his way, and the strong injunctions of the law pressed upon him. There are some other striking singularities in the case, but I will not spend time in commenting upon them, because the foregoing, left as they are without explanation, would perhaps be decisive. But when we take into consideration the depositions introduced by the United States, of three of the crew, it is altogether unreasonable to expect, that the court could be free from doubt. Some exceptions have been taken to apparent incongruities and exaggerated statements made by some of the witnesses. Perhaps these exceptions are well founded; but admitting their force, still, taken with all their imperfections on their head, the depositions contain in general a substantial coincidence, as to material facts, which I must say are either corroborated, or not fully contradicted by the testimony on the other side. Now if these depositions are believed, there is no longer any doubt in the case; the justification is wholly unsupported. On the whole, I am satisfied that the decree of the district court ought to be reversed, and that the ship and appurtenances should be condemned, with costs, to the United States.

Condemned.