# APPENDIX.

— ◆◆ —

*IN THE MATTER* of the Oath to be taken by Attorneys and Counsellors of the National Courts, under the Act of Congress of January 24th, 1865.

*Ex parte*, William Law, *Petitioner.*

An Attorney and Counsellor, duly admitted to practice in a Court of the United States, and practicing therein, prior to the late civil war, and who has received and accepted a full pardon from the President, and taken the oath of amnesty, may resume his practice in said Court without taking the oath prescribed by the Act of Congress, of January 24th, 1865. Said Act, in its application to such a person, is unconstitutional and void.

Motion. In the District Court of the United States, for the Southern District of Georgia. Decided by Judge Er-skine. At Savannah. May Term, 1866.

The facts will be sufficiently stated in the opinion of the Court as delivered by—

Erskine, J. William Law, Esquire, produced in Court satisfactory proof that in the year 1817, he was, by the Circuit and District Courts of the United States for the District of Georgia, duly admitted to practice as an attorney, proctor, solicitor, advocate and counsellor at the bar of said Courts, respectively; that he has been, since the year 1859, hitherto, attorney or proctor of record in the case of *Finigan et. al.* vs. *The Ship Parliament*—a cause now depending on the

Admiralty side of this Court; that he has taken the oath of Amnesty; that upon the promulgation by the President of the United States, of the Proclamation of May 29, 1865, he found himself within its thirteenth exception; that he applied to the President for pardon and amnesty under this Proclamation; and that he received a grant of pardon and amnesty, and accepted the same, and has filed in the office of the Clerk of this Court an authenticated copy of said acceptance.

Upon these proofs, Mr. Law asked to be allowed to appear and be heard in behalf of his clients in said cause, without being first required to take and subscribe the oath prescribed by the Act of Congress, approved January 24, 1865.

The petitioner was informed by the Court that this law of Congress was imperative, and could not be pretermitted. Thereupon, he submitted to the Court, that the statute was repugnant to the Constitution of the United States, and requested permission to show cause against it. This was granted, and during the early part of this term the case was fully and ably argued by the Petitioner, *propria persona*, by *Ex-Gov. Joseph E. Brown*, of the Northern District, and *Thomas E. Lloyd, Esquire*, of Savannah. The reply on behalf of the Government by *Henry S. Fitch, Esquire*, United States Attorney, to the arguments of these learned counsel, was replete with legal scholarship.

Prefatory to entering upon the examination of the various questions regularly discussed, so much of the original Act of Congress of July 2, 1862, and its supplement of January 24, 1865, as is thought essential to an easier comprehending of the grave and important inquiries now before the Court, may be cited. The original Act is entitled " An Act to prescribe an oath of office, and for other purposes." It declares that, " Hereafter every person elected or appointed to any office of honor or profit under the Government of the United States, either in the civil, military, or naval departments of the public service, excepting the President of the United States, shall, before entering upon the duties of such office,

and before being entitled to any of the salary or other emoluments thereof, take and subscribe the following oath or affirmation :

"I, A. B., do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof : that I have voluntarily given no aid, countenance, counsel, or encouragement to persons engaged in armed hostility thereto ; that I have neither sought nor accepted, nor attempted to exercise the functions of any office whatever, under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power, or constitution within the United States, hostile or inimical thereto.  And I do further swear (or affirm) that, to the best of my knowledge and ability, I will support and defend the Constitution of the United States against all enemies, foreign and domestic ; that I will bear true faith and allegiance to the same ; that I take this obligation freely, without any mental reservation or purpose of evasion, and that I will well and faithfully discharge the duties of the office on which I am about to enter, so help me God."

And the supplementary Act provides : "That no person after the date of this Act shall be admitted to the bar of the Supreme Court of the United States, or at any time after the fourth of March next, shall be admitted to the bar of any Circuit or District Court of the United States, or the Court of Claims, as an attorney or counsellor of such Court, or shall be allowed to appear and be heard in any such Court, by virtue of any previous admission, or any special power of attorney, unless he shall have first taken and subscribed the oath prescribed in 'An Act to prescribe an oath of office and for other purposes, approved July 2, 1862,' according to the form and in the manner in said Act provided," etc.

The point having been made, whether an attorney, or counsellor at law, as such, holds a public office or place, or is to be regarded as a mere officer of the Court,—and there being a diversity of opinion among learned judges on this point,—it is proper that the views of this Court should be expressed.  In Lord COKE's time, and prior thereto, an attorney—but not so a counsellor—was, it seems, considered a public officer ; for he says : "That in an action of debt by an attorney for his fees, the defendant shall not wage his law, because he is compellable to be his attorney." Co. Litt. 295 *a*.  Afterwards, however, Lord HOLT (1 Sal., 87) held, that he was not compellable to appear for any one, unless he takes his fee, or backs the warrant ; and so the law has con-

tinued in England to this day. In the following cases: *In the matter of Wood*, Hopk. 6; *Seymour* v. *Ellison*, 2 Cow., 13; *Merritt* v. *Lambert*, 10 Paige, 352; *Ray* v. *Birdseye*, 5 Denio, 619; and *Watts* v. *Whittemore*, 22, Barb. 246, practitioners of the law are said to be public officers; but in the first mentioned case only was the question up for decision. In the *Adm'rs of Byrne* v. *Adm'rs of Stewart*, 3 Dess. 456; *Leigh's case*, 1 Mumf. 458; *In the matter of the oaths to be taken by attorneys and counsellors*, 20 Johns, 492; *Richardson* v. *Brooklyn City and Newtown R. R.*, 22 How., P. R. 368; and *Cohen* v. *Wright*, 22 Cal., 293, they are held not to be public officers. And it was remarked by PLATT, J., in 20 Johns, 493 : " As attorneys and counsellors they perform no public duties on behalf of the government; they execute no public trust."

Having collated and well considered these State authorities, I am of the opinion that the law is with the negative of the question. Nor do I think that Congress—and it is the intention of the National Legislature, as found in the statute, that guides this Court—considered them public officers. In article one, section six, cl. two of the Constitution, it is declared, that " no person holding any office under the United States shall be a member of either house during his continuance in office." Has it ever been seriously questioned that practicing as an attorney or counsellor in the Federal Courts, is inconsistent with holding, at the same time, the office of Senator or Representative in Congress? Neither was there any statutory prohibition to practicing in any of the Federal Courts until the passage of the Act of Congress, approved March 3, 1863; and the inhibition is confined to the *Court of Claims.* 12 Stats. at Large, 765. *See Amendment to Rule II. of Supreme Court United States*, 2 Wall vii.

Two questions—each of importance in the investigation of this case—spring from the preceding conclusion : Whether this Court, in admitting Mr. Law to its bar, acted judicially or ministerially ? And whether, if his admission was a ju-

dicial act, it gave him a property in his profession or office of attorney and counsellor ?

The Constitution ordains that " the judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as Congress may from time to time ordain and establish." Art. iii, sect. i.   Accordingly, at the first session of Congress, an Act was passed "to establish the judicial Courts of the United States."   The additional courts established by it are the Circuit and District Courts ; and notwithstanding these Courts are denominated inferior Courts, they are not so considered in the technical use of that term.   4 Dall., 11 ; 5 Cranch, 135 ; 8 How., 586.   The District Courts of the United States, under their own proper powers, are Courts of law and admiralty.   The distinctive grades in the legal profession which prevail in England, and to a limited extent in some of the courts of this country, have no substantial recognition in the Circuit or District Courts of the United States ; in these the offices of attorney, proctor, advocate and counsellor are usually combined in one person.   The 35th section of the judiciary Act of 1789 declares " that in all the Courts of the United States, the parties may plead and manage their own causes personally, or by the assistance of such counsel or attorneys at law, as by the rules of said Courts *respectively*, shall be permitted to manage and conduct causes therein."

Directly bearing upon the first of these questions is the case of *The Commonwealth ex rel, etc., of Breckenridge* v. *The Judges of the Court of Common Pleas of Cumberland County*, 1 S. & R., 187.   A motion was was made for a mandamus to be directed to the Judges of that Court, commanding them to proceed to the examination of the relator, and if found competent, to *admit* him to practice in that Court, as an attorney, etc.   TILGHMAN, C. J., said, " If it becomes a question whether the rules have been complied with, the Court must decide.   Can this be a ministerial act ? or rather can anything be more decidedly judicial?   The right of Mr. Breckenridge has been judicially decided ; and if he is left

without remedy by appeal, he is but in the situation of many other persons who have important interests decided in the court of common pleas; for many points of great importance are decided on motion, in which neither appeal nor writ of error lies." And on p. 195, YEATES, J., says, "In the admission of an attorney the court acts judicially, not ministerially." The mandamus was denied.

The case of *McLaughlin* v. *The District Court*, 5 W. & S. 272, was a motion for a rule to show cause why a mandamus should not issue to the district court, commanding it to *restore* the relator. ROGERS, J., announcing the opinion of the court, said: "It is ruled in *The Commonwealth ex rel., &c.,* v. *The Judges of the Court of Common Pleas*, 1 S. & R. 187, that the admission of an attorney by a court of common pleas is a judicial and not a ministerial act, and for that reason not the subject of a mandamus. That case is an authority directly adverse to the present application; in principle there is no conceivable distinction between them. If the admission of an attorney to the bar be a judicial act, by parity of reasoning, his dismission must be judicial also."

*In the matter of the application of Henry Cooper*, 8 Smith, 67, the first Head Note is in these words: "In the admission of attorneys and counsellors the Supreme Court acts judicially. The function is not of an executive character." SELDON, J., in delivering the opinion of the court, referring to *ex parte Secombe*, 19, How. 13, and to other cases, said: "If the removal or suspension of an attorney be, as was held in these cases, a judicial act, it is difficult to see how the admission of an attorney is any the less so; especially when, as here, the court in the act of admission is required to pass, not only upon the sufficiency of the evidence of certain facts, but upon the constitutionality and validity of a statute, and thus to exercise the highest judicial functions ever entrusted to a court."

The case of *Secombe* was briefly as follows: "The supreme court of the Territory of Minnesota was empowered by a Territorial statute to remove any attorrney for wilful mis-

conduct. Under this law Mr. Secombe was removed; and the order for removal set forth the cause. He presented a petition to the Justices of the Supreme Court of the United States, praying a mandamus to the supreme court of the Territory, commanding it to vacate the order. The prayer was denied. And Chief Justice TANEY, in giving the unanimous opinion of the Court, said: "The removal of the relator, therefore, for the cause above mentioned, was the act of the Court done in the exercise of a judicial discretion, which the law authorized and required it to exercise." And on page 15, he remarks: "The Court, it seems, were of opinion that no notice was necessary, and proceded without it; and, whether this decision was erroneous or not, yet it was made in the exercise of judicial authority, where the subject-matter was within their jurisdiction, and it cannot therefore be revised and annulled in this form of proceeding." See also *ex parte Burr.* 9, Wheat., 529.

The authorities from which these quotations are taken, are in themselves sufficient and conclusive to show, not only that the admission of an attorney, or counsellor, but likewise his suspension, or disbarment, is a judicial act or judgment. The admission of an attorney, or counsellor, where no fraud has been practiced on the Court, gives him the office for life. This privilege, franchise, or right to practice in the Court, has annexed to it the condition that his character shall continue fair, and that he will not abuse his office by criminal or immoral conduct. As an attorney, or counsellor, in my judgment, does not hold a public office or place, there is no forfeiture for nonuser:—for if he chooses to practice his profession, he may do so; if not, not; he may withdraw from the practice and resume it at pleasure; he may be raised to the Bench, as was the petitioner himself,—and where, from 1829 to 1835, in our highest State judicial tribunal, he presided with great learning and honor—and return to the bar again. *Vide. In the matter of Dormenon*, 1 Mar. 129. Carthew, 478.

The second question is, whether the petitioner, by virtue

of his admission to the bar of this Court, has a property in his profession or office? The case of *The Adm'rs of Byrne* v. *The Adm'rs of Stewart*, arose on a statute which inhibited persons holding certain offices under the State from practicing in the courts. The chancellor, in his opinion, remarked: " But the objection of most weight is, that this act, as it affects the defendant, will deprive him of a right which may fairly be considered a species of property. It cannot be denied that a man's trade or profession is his property, and if any law should be passed avowedly for the purpose of restraining any member of the bar, who is not a public officer, from exercising his profession, I should declare such law void." In 20 Johns. R. 492, the court say, that attorneys and counsellors "exercise a privilege or franchise." And ORMOND, J., in the case of *Dorsey, supra*, in speaking of the right to practice law, asked : " Can it be seriously contended that it is not a valuable right, and as deserving of protection as property ?"

*In the matter of John Baxter*, decided at the May Term, 1865, of the Circuit Court of the United States for the Eastern District of Tennessee, TRIGG, J., construing the Act of Congress of Januaay 24, 1865, said: " For if he" [the attorney] " neglects or refuses to take the prescribed oath, he is as effectually deprived of his office and the fees and emoluments thereof, as he could be by a forfeiture of the same upon a regular trial and conviction by *due process of law*, for the offences mentioned. These fees and emoluments," continues the judge, " are as much the *property* of the attorney as any choses in action can, in law, be the property of any other citizen ; and, being property, the law in question, to the extent mentioned, punishes the attorney by a *forfeiture* of his property." *Opinion of the Honorable Connally F.* TRIGG, Pamph. p. 10. Memphis, Tenn., 1865. This case and *Cohen* v. *Wright*, are the only reported cases that I have seen, in which this question came regularly before a court. In *Cohen* v. *Wright*, the Court, CROCKER, J., delivering the opinion— in which NORTON, J., specially concurred—said : " The right

to practice law is valuable to the possessor only.  It cannot descend or be inherited, bought or sold, conveyed or transferred, can be divested and destroyed by mere order of the court, is subject to forfeiture by mere loss of moral character on the part of the possessor, and cannot, therefore, in any proper sense be deemed 'property,' or amount to a 'contract,' in the Constitutional meaning of those terms." But the courts in approaching this conclusion, say: "If the right of the attorney to practice law is property, within the clear intent and meaning of the constitution, there is much force in the position that the statute by depriving him of the right, without a judicial investigation, such as is usual in cases of that kind, violates this provision.  Still it is not so clear as to be beyond a doubt, for it can hardly be said that he is 'deprived' of any thing when the law leaves it open to him to resume his privileges at any time by taking the oath, a failure to do which is his own fault."  In another part of this opinion this oath will be transcribed and referred to.

Comparing the ruling of the United States Circuit Court, on this point, with that of the supreme court of California, it will be seen that the views of these Courts are opposed; at least, there is some diversity of opinion.  The former Court shows that an illegal result follows, by reason of the Act of Congress depriving the attorney of his office.  In other words, if the attorney will not, or cannot take the oath, the statute itself deprives him of the fees and emoluments becoming due to him while in possession of his office under the sanction of the Court.  The latter Court—if my interpretation is not erroneous—holds that no unlawful consequence follows, because the attorney has no property in his office, in the constitutional sense of that term.

That an attorney, or counsellor has a property in his fees and emoluments by the common law, or by contract expressed or implied with his client, and legal modes of recovering the same, is well established.  1 Bac. Ab. *Attorney* (F.)  2 Gr. on Ev. sec. 139: 14 Geo. 87.

The first division of the last clause of the fifth article of

the Amendment to the Constitution of the United States, ordains that no person shall "be deprived of life, liberty or property without due process of law." This declaration exhibits a summary of all the antecedent precautions contained in this article, and it places property in the same category with the more exalted blessings of life and liberty. Where property is possessed or owned by a person under existing laws, or where he has secured to him, by judicial authority (as in the case of an attorney or counsellor) the right or privilege to acquire and own property by his professional skill and industry, (supposing this right or privilege of future acquisition and ownership is, under the provision of the Constitution, property, and therefore, equally protected with property over which the owner has prehensible power,) then he cannot be deprived of the property, nor can the right, privilege, or franchise mentioned be extinguished, by the declaration of Congress, *per se*. And if he has forfeited either, the facts must be ascertained by due process of law, before the judicial tribunals of the country.— *Vide Murray's Lessee et al.* v. *Hoboken Land and Improvement Company*, 18 How. 272.

Whether, when an attorney or counsellor is, by the Court, regularly licensed and admitted to practice law, this bestows upon him a property in his profession or office, is a question so interwoven with nice distinctions, that it is far from being easily resolved; but the present inclination of my mind is that it is not property, in the sense and import of that word or term as used in the Constitution; still, it is a right, privilege, or species of franchise under the immediate sanction and protection of the Court. I do not, however, entertain the remotest doubt of the power of Congress, acting within the limits of its Constitutional authority, to prescribe by law who may be attorneys or counsellors of the national Courts, their qualifications, mode of admission, suspension and disbarment.

SELDON, J., in *Waynehamer* v. *The People*, 3 Ker., 433, gave the following definition of property: "Property is the

right of any person to possess, use, enjoy and dispose of a thing. The term, although frequently applied to the thing itself in strictness means only the rights in relation to it, (*Bouvier's Law Dic.; 1 Bla. Com.*, 138; *Webster's Dic.*)" And, indeed, after a most careful examination of all the authorities within my reach, I have failed to discover a definition of property stripped of the attributes of enjoyment and alienation. *Grotius*—Book 2, ch. 6, sec. 1, says: The exclusive right of using and transferring property follows as a natural consequence from the perception and admission of the right itself.

The petitioner having brought into Court a charter of full pardon and amnesty, granted to him by the President of the United States, and filed with the Clerk an authenticated copy of his acceptance of the same, urged that this act of Executive clemency relieves him from being required, before he can appear and be heard as an attorney or counsellor in this Court, to take and subscribe the oath prescribed by the Act of January 23, 1865, because, as he says, this pardon and amnesty has restored him to all the rights subject to forfeiture by reason of his having "voluntarily participated in the rebellion." The Constitution (Art. ii., sec, ii, cl. 1), affirmatively vests in the President of the United States the sole power to grant reprieves and pardons, except in cases of impeachment. And the very nature and necessity of such an authority in every government, arises from the infirmities incident to the administration of human justice.

In *ex parte Wells*, 18 How., 307, Mr. Justice WAYNE, in delivering the opinion of the Supreme Court of the United States, made use of the following language: " Without such a power of clemency, to be exercised by some department or functionary of a government, it would be most imperfect and deficient in its political morality, and in the attributes of Deity, whose judgments are always tempered with mercy." Mr. SPEED, Attorney-General of the United States, in his Opinion of May 1, 1865, elucidates in a masterly manner, the Constitutional power of the President to grant pardon and

amnesty. And in defining these terms, he says: "A pardon is a remission of guilt; an amnesty is an act of oblivion or forgetfulness. They are acts of sovereign mercy and grace, flowing from the appropriate organ of the Government.— There can be no pardon where there is no actual or imputed guilt.—The acceptance of a pardon is the confession of guilt, or of the existence of a state of facts from which a judgment of guilt would follow." In a subsequent part of the Opinion he remarks : " After a pardon has been accepted it become a *valid* act, and the person receiving it is entitled to all its benefits." Afterwards he says: " Persons who have been constantly engaged in rebellion, should know distinctly what they are to do, when and how they are to do it, to free themselves from punishment, in whole or in part, or to re-instate themselves as before the rebellion." In 12 Mod. R., 119, it is held that "Where a crime is pardoned, all the effects and consequences thereof are also discharged."

I will not venture to illustrate or expand these citations, or to discuss this subject at length, but will bring my remarks to a close in a very few words. The language of the Act is explicit; and although it applies to a single order of persons only, it is gratuitous to say that it was the intention of Congress to limit the oath to any particular individual or class of this order ; the plain words of the Act are, that it shall comprehend every attorney or counsellor upon his admission to the bar of a national Court, or who had been admitted previous to the 4th of March, 1865. Yet the effect of the statute is, that while of force, neither pardon nor amnesty avail the petitioner, so as to make him a " new man." 4 Bla. Com. 402.

Was this result—this impossibility—foreknown to Congress ?

Admit that this statute is of the character contemplated by Sir WILLIAM BLACKSTONE. " But where," says that author, " some collateral matter arises out of the general words and happens to be unreasonable, there the judges are, in decency, to conclude that this consequence was not fore-

seen by the parliament, and, therefore, they are at liberty to expound the statute by equity, and only *quoad hoc* disregard it." 1 Com. 91.. What is said by the Commentator relates to the British constitution; but whether such reason alone, for setting aside a statute, or any portion of it, would obtain in this country, is very questionable. *See* IREDELL, J., in *Calder* v. *Bull*, 3 Dall., 386; *Cochran* v. *Van Surly*, 20 Wend., 381; *The City of Bridgeport* v. *The Housatonic Rail Road Company*, 15, Conn., 475; *Parker* v. *Commonwealth*, 6 Barr, 507. *But* vide *Ross'* case, 2 Pick., 165; remarks of PARKER, C. J.

Chancellor KENT. (1 Com., 448,) says: "If there be no constitutional objections to a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power under any other form of government." Here we have a written Constitution, forming the paramount and fundamental law of the nation, wherein is designated the powers and duties of the national Legislature, as well as of the other departments of the government; therefore, it must follow as a consequence, that none of the co-ordinate branches can infringe the power of any of the others—each division, legislative, executive, and judicial, must remain confined within its own Constitutional limits.

It was ingeniously argued by one of the learned counsel, ex-Gov. Joseph E. Brown, that this Act imposes a penalty which cannot be remitted, and inflicts a punishment beyond the reach of Executive clemency. Whether this statute really passes the Constitutional boundary, and is subversive of the pardoning power of the President, is a question of so nice and delicate a nature, that the solution of it would demand the most profound consideration; but, as the case before the Court does not absolutely require this question to be resolved, it will not be attempted. *See* Story on the Constitution, sec. 1498.

On the part of the petioner it was contended that the Act of January 24, 1865—(in which the oath of office of July 2,

1862, may be, by relation, considered as embodied) ~is in the nature of a bill of attainder.

Bills of attainder are statutes enacted by the supreme legislative power, *pro re nata*, inflicting capital penalties, *ex post facto*, without conviction in the regular course of administration through courts of justice.

But it has been contended in argument that the person or persons to be affected must be named in the bill, otherwise it is not a statute of this character. Dr. WOODDESON in his *Vinerian Lectures*, 13 Law, Lib. 510, lends a general substantiation to this position. He says: "It has been usual in times of domestic rebellion to pass acts of parliament inflicting the penalties of attainder on those *by name*, who had levied war against the king, and had fled from justice, provided they should not surrender by a day prefixed." Acts of attainder were generally framed in accordance with the foregoing extract, but not always so; for there are in the statute books, both of England and of Ireland, many statutes of attainder wherein whole classes of people, in bulk, were attainted, adjudged and convicted of high treason, without being named or otherwise legally designated; and without being called, arraigned, or tried. But a distant allusion alone to these bills of attainder,—and which, in several material respects, differ from those mentioned by WOODDESON, and other writers,—is not sufficient to an understanding of the grave question under immediate examination; therefore, so much of such of them as may direct to a legitimate legal conclusion, may not inaptly, I think, be transcribed. At a Parliament held at Westminster, the statute of 26 Hen., viii., c 25, 3 Stats. of the Realm, 529, was passed. It is entitled "An Act concerning the Attainder of Thomas Fittzgaralde, Erle of Gildare." It attaints first the Earl of high treason and deprives him of his estate, title, etc. Sec. II declares, "That all such persons which be or heretofore have been comforters, partakers, abettors, confederates, and adherents unto the said Erle in his said false and traitorous acts and purposes, shall, in likewise stand and be attainted, adjudged

and convicted of high treason." By sec. III, it is provided, "That the same attainder, judgment, and conviction against the said comforters, partakers, abettors, confederates and adherents, shall be as strong and effectual in law against them, and every of them, as though they, and every of them, had be (*sic*) specially, singularly and particularly named by their proper names and surnames in this said Act." Sec. IV enacts, that as well the said Earl, as other his said comforters, abetters, etc., " shall have and suffer execution of death for the same accordingly." Sec. VII, provides, that the attainder is not to be " hurtful or prejudicial," if they submit by a pre-signified day to the king or his lieutenant.

This boon is denied in the next bill of attainder against Kildare, his uncles, and adherents. It will, therefore, be cited to show the terrible severity of some of the attainders.

Some two years subsequent to the enactment of the preceding, the 28 Hen., viii, c 18, *Id.* 694, was passed. This statute is entitled, " An Act concerning the Attainder of Thomas Fittzgaralde, and of his V Uncles." First reciting the 26 Hen., viii, c 25, it declares that, " The said Thomas, late Erle of Gyldare, by whatsoever name or names he be called; James Fittzgaralde, *Knight;* John Fittzgaralde; Richard [Fittzgaralde]; Olyver Fittzgaralde; and Walter Fittzgaralde, be attainted, adjudged and convicted of high treason;" * * * * and that the said Thomas shall loose his title, dignity and estate of Earl of Gyldare. Section II, as in the preceding Act, attaints " all such persons which be or heretofore have been comforters, abettors, partakers, confederates or adherents unto the said James Fittzgaralde, late Erle, or unto his said uncles, and every of them. Section III. " And be it further enacted, by the authority aforesaid, that the same attainder, judgment, and conviction against the said comforters, abettors, partakers, confederates and adherents, shall be as strong and effectual in law against them, and every of them, as though they and every of them, had been specially, singularly and particularly named by their proper names and surnames in [the] said Act." Sec-

tion IV. " And be it further enacted by the authority aforesaid, that as well the said Thomas, late Erle, James Fittzgaralde, *Knight:* John Fitzgaralde ; Richard Fittzgaralde ; Olyver Fittzgeralde ; and Walter Fittzgaralde, now being in the Tower of London, for their said treason, and every of them, as the said comforters, abettors, partakers, confederates and adherents, and every of them, shall have and suffer execution of death for the same accordingly," * * * * and shall forfeit their estates, etc. "And that they, and every of them, for their said false and traiterous offenses, shall loose the benefit, liberation, and privilege of all sanctuaries."

Shortly after the passing of this attainder—and without any trial whatever—the young Kildare and his five rebel uncles were hanged at *Tyburn*. *Herbert's Life and Reign of Henry the Eighth*. P. 491. Ed. of 1682.

In Bishop Burnet's history of the Reformation, 1—Part 2—243, ed. of 1825, is printed at length, Parliamentary Roll, Act 60, *anno regni tricesimo secundo*, Henry 8, and this statute enacts, *inter alia*, that Thomas, late Earl of Essex, " shall be and stand by authority of this present parliament, attainted and convicted of heresy and high treason, and shall be adjudged an abominable and detestable traitor, and shall have and suffer the pains of death." He was executed without more ado.

The 24th Eliz., ch., 1 *Irish* Stats. at Large, 391, attainted and convicted James Eustace, late Viscount Baltinglas, and his brothers, Edmund, Thomas, Walter, and Richard, of high treason ; and by sec. II., prescribed as follows : "That as well the said James, and all others the said offenders and persons before named, AS SUCH OTHERS who by actual rebellion, and other traitorous practices have committed like abominable and detestable treason and rebellion, and have died and been slain in their said actual rebellion and treasons, or otherwise been, by martial law, executed for the same, and every of them, for said abominable and detestable treasons, by them and every of them, most abominably

and traitorously committed, perpetrated and done against your highness," etc., " shall be, by authority of this present parliament, convicted and attainted of high treason. And that as many of the said offenders and persons before named, as be yet in life, shall and may, at your highness' will and pleasure suffer the pains of death as in cases of high treason," etc.

Here the living and the dead alike were attainted and convicted. Many other acts might be cited, in which deceased persons were attainted. Let one (and it is the last of the kind, I believe,) suffice : The 12 Car., ii c. 30, attainted the remains of the great Lord Protector CROMWELL, and others who had sat in judgment on Charles the First. And by order of the parliament they were taken out of their graves and hanged in their shrouds. 1 Pepys Diary, 149. Ed. 1854.

The foregoing citations are amply sufficient to show (among other matters pertinent to this subject) that to constitute a statute of attainder, it was not necessary to name the persons accused, nor to call upon them to appear and defend before judgment.

Other occasional acts of parliament of a kindred nature to bills of attainder—but which inflict a punishment milder than death—known as bills of pains and penalties, will be noticed. Treason itself has, in some instances, been pun- ished by these statutes, as in the case of Lord Monson, Sir Arthur Haselrig and others, who had been members of the High Court of Justice. 12 Car., ii, c. 11, secs. 38 and 39. The 19 Car., ii., c. 10, adjudged the Earl of Clarendon a banished man for life, if he did not return to England within a certain period, and surrender himself for trial. The 9 Geo., 1, c. 18, 5 Stats. at Large, 477, ordered Bishop Atter- bury to depart the realm on, or before, a fixed day ; sen- tenced him to perpetual exile, and made it felony in him to return ; and deprived him of all his offices, dignities, etc. This bill was passed, on what was, at the time, a bare sup- position, that he was conspiring to bring in the Pretender.

Of the nature of bills of pains and penalties, and also

closely allied to more than one of the acts of attainder quoted, are those statutes which despoiled certain portions of the people,—and in one memorable instance a whole community, in gross,—of their civil rights, without denominating by name, or other legal special manner, the persons to be affected, or summoning them to appear and defend. The 22 Geo., iii., c. 31, disfranchised all the electors of Crickdale below a certain yearly rental. By the 1 and 2 Geo., iv., c. 47.    8 Stats. (U. K.) at Large, 358, the entire body of voters of Grampound were deprived of their electoral privileges.

In England a distinction is taken between bills of attainder, and bills of pains and penalties; but when carefully noted and compared they will be found akin, and in close fellowship; and the following extract will prove the nearness of their identity.    While the bill to inflict pains and penalties upon John Plunkett, was pending before the House of Lords, it was ordered by that House, that the opinion of the judges be asked, "Whether if John Plunkett shall, after the passing of this bill, be indicted for the treasons of which he stands charged in this bill, he can plead this act in bar of such indictment?"    And the judges, through the Chief Justice, answered: "That, if the said bill should pass into a law, he may plead the same in bar of such indictment."    16 State Trials, 365.    If the Act of Congress of January 24, 1865, or any part of it, be in the nature of a bill of attainder, and as such would effect the petitioner, it cannot be deemed any the less so because he is not named in it.    And like reason would hold good, if it be technically, or in the nature of a bill of pains and penalties.    DUER on the Constitutional Jurisprudence of the United States, Lect. xi.    Mr. Justice STORY says : "But in the sense of the Constitution, it seems, that bills of attainder include bills of pains and penalties; for the Supreme Court have said "A bill of attainder may affect the life of an individual, or confiscate his property, or may do both."    Story on the Constitution, sec., 1338, citing; *Fletcher* v. *Peck*, 6 Cranch., 138, and 1 Kent, Lect. xix.

Whether the Act of January 24, 1865, is in the nature of a bill of attainder was a point in judgment *In the case of John Gill Shorter, and other attorneys, for leave to practice in the Circuit and District Courts of the United States, for the District of Alabama, without first complying with the requirements of said statute.* And BUSTEED, J., in an opinion marked by precision and force, said: " Does it not in fact disfranchise the class of men known as lawyers, under the pain of not taking the oath it prescribes? Is not this the logical and necessary consequence of their refusal? Does it not disfranchise them when it requires .them to take the prescribed oath, before they can exercise their vocation? Is it not an assumption by the legislature of judicial magistracy? Is it not 'pronouncing upon the guilt of the party without any of the common forms and guards of trial?'" *Decision of the Honorable Richard* BUSTEED. Mobile *Register and Advertiser*, Dec. 17, 1865.

Bestowing upon this particular question the utmost care and solicitude—and with unfeigned regret of my inability to discuss it in a manner answerable to its gravity—I cannot regard the retrospective part of this oath otherwise than as a bill of pains and penalties—possessing the characteristic attributes of a bill of attainder, except the death penalty. In the arbitrary, technical sense it may not be so called; but when it is so plainly observable that by its own inherent force it effectuates the destruction of the rights of a large order of persons, and is substantially and in effect a bill of pains and penalties, I know no other term in our language adequate to express it. By operation of the legislative will alone, the petitioner is already adjudged—adjudged without due process of law; and, although forthcoming, not called to trial, according to the general laws of the land; the statute affecting his person as directly and accurately, as though he were named in its body—disenabling him from appearing or being heard, as an attorney or counsellor, at the bar of this Court, and thereby depriving him of the ·right to acquire and own property, by his professional skill and labor.

But if the conclusion at which I have arrived is erroneous, and the retroactive clauses of the oath do not contravene any portion of the Constitution of the United States, still he is encompassed by an impassible barrier during the remainder of his days, or until these supposed obnoxious clauses of the oath are modified or repealed by Congress.

The following additional objections were presented: First, that the Act of Congress of January 24th, 1865, is a penal law. This may be disposed of at once. After a careful analysis of this statute, and perceiving, as I apprehend, the manner in which it necessarily affects the party now before this Court, it seems clear, on principal and on authority, that the several retrospective divisions of the oath are highly penal. The following cases are referred to, in support of this expression: *Leigh's case; Dorsey's case; In the matter of Shorter et. al.; In the matter of Baxter.* Agreeing with these authorities, this question may be considered settled, so far as this Court is concerned, until such time as the Supreme Court of the United States shall have decided it otherwise.

The *second* objection taken was, that the Act is in violation of so much of the ninth section of the first article of the Constitution as declares that no " *ex post facto* law shall be passed ;" and also that it contravenes that clause of the fifth section of the first article of the amendments to the Constitution, which prohibits any person from being compelled, in any criminal case, to be a witness against himself, or being deprived of life, liberty and property without due process of law.

In the case of *Leigh, supra,* Mr. Leigh applied to the Supreme Court of Appeals of Virginia for admission to its bar. But he was met by a statute of that State, requiring " every person who shall be appointed to any office or place, civil or military, under the commonwealth, shall, in addition to the oath now prescribed, take the following oath," to-wit: " That he hath not been engaged in a duel by sending or accepting a challenge to fight a duel, or by fighting a duel, or

in any other manner in violation of the act 'entitled an Act to suppress duelling,' since the passage thereof;" and further, that he will not be concerned directly or indirectly in such duel, during his continuance in office.  *Id.* 485.  The point for judgment in this case was, whether practitioners of the law were public officers?  Tucker, J., was of opinion that they were.  But Roane, J., and Fleming, C. J., decided otherwise.  Mr. Leigh was admitted without taking the additional oath.  The majority of the court, in their opinions, animadverted upon the statute in very expressive terms.  Roane, J., said: "It is unusally *penal,* if not tyrannical, in compelling a party to stipulate upon oath, by the 3d section, not only in relation to his past conduct, and present resolution, but also for the future state of his mind."  And the Chief Justice—after remarking that it was an "oath unknown to the laws of the State, or of the United States"—adds : "I cannot but consider it a penal statute, and as *such* must give it a strict interpretation."

*In the matter of John Dorsey, supra.*  On the seventh of January, 1826, the Legislature of Alabama passed an Act, commanding all public officers, and attorneys and counsellors at law, before entering upon the duties of their offices or stations, to take the following oath, to-wit : " I do solemnly swear that I have neither directly or indirectly, given, accepted, or knowingly carried a challenge in writing or otherwise, to any person or persons (being a citizen of this state) to fight in single combat, or otherwise, with any deadly weapon, either in, or out of the state, or aided or abetted in the same, since the first day of January, 1826 ;" and that he will not hereafter give, accept, or knowingly carry a chal-lenge, etc.  " And any attorney or counsellor at law, failing or refusing to take the said oath, shall not be permitted to practice, as such, in any court of this state."

The validity of this Act came regularly before the court, and a majority of the members decided the retroactive portion of the oath to be unconstitutional and void.  Collier, C. J., dissented.  Goldthwaite, J., in delivering the opinion,

said: " I have given the subject the consideration demanded by its importance as a constitutional question, and am convinced that one part of the oath imposed by the general assembly, usually called the duelling act, is inhibited by the constitution. As the oath is not divisable, and is, in part, unwarranted by the fundamental law, in my opinion, we ought not to require it to be administered." ORMOND, J., said: "This is a highly penal law; it excludes, unless its terms are complied with, all persons from practicing as attorneys and counsellors at law in the courts of this state." On p. 380, he says: "The tenth section of the bill of rights, among other things, provides that no one 'shall be compelled to give evidence against himself, nor shall he be deprived of his life, liberty, or property, but by due course of law.' After a patient and mature examination of the matter, I am of opinion that the requisitions of the expurgatory oath, exacted by this law, offends against this portion of the bill of rights."

The case of *Cohen* v. *Wright, supra,* arose on an Act, passed April 25, 1863, by the legislature of California, entitled "*An act to exclude Traitors and Alien Enemies from the Courts of Justice in Civil Cases.*" The 3d section of the Act reads: "No attorney at law shall be permitted to practice in any court in this state until he shall have taken, and filed in the office of the county clerk of the county in which the attorney shall reside, the oath prescribed in this act; and for every violation of the provisions of this section, the attorney so offending shall be considered guilty of a misdemeanor, and on conviction shall be fined in the sum of one thousand dollars." The following is the form of oath to be taken by plaintiffs, defendants, and attorneys, to-wit: " I [here insert the name of the plaintiff] do solemnly swear that I will support the Constitution of the United States, and the constitution of the state of California; that I will bear true faith and allegiance to the Government of the United States, any ordinance, resolution, or law of any state, or territory, or of any convention or legislature thereof, to

the contrary notwithstanding; that I have not, since the [here insert the date of the passage of this act] knowingly aided, encouraged, countenanced, or assisted, nor will I hereafter, in any manner, aid, encourage, countenance or assist the so-called Confederate states, or any of them, in their rebellion against the lawful Government of the United States; and this I do without any qualification or mental reservation whatsoever." The first and second clauses of the oath state, in plain terms, that the affiant will support the Constitution of the United States, and the constitution of the state of California. " The next clause," says Mr. Justice CROCKER, in delivering the opinion of the court, " that the party has not, since the passage of the act, and will not aid, encourage, countenance or assist those now in rebellion against the United States, is a solemn declaration or pledge; a declaration that the party has not committed since the passage of the law, and a pledge that he will not commit any treasonable act against the National Government. So far as it is a pledge of future good conduct, it is but expressing in another form that he will support the Constitution, and bear true allegiance to the United States, and to that extent clearly is not opposed to this section " [Art. ii, sec. iii] " of our state constitution. So far as it is a declaration of past conduct, it seems to go beyond the strict letter of the constitutional oath, and we have, therefore, had a doubt of its validity. It does, however, but carry out the object, design, and spirit of the constitutional oath; and as it is not an unreasonable requirement, being confined to acts since the passage of the law, and does not clearly violate the constitution, we are unwilling to declare it void on a mere doubt." " The act," say the court, toward the close of this branch of the case, " is not retrospective, as it merely requires the party to swear that he has not committed any treasonable act *since* its passage. It does not relate to any act done *before* that time."

*In the matter of Baxter, supra*, TRIGG, J., said: " Now, assuming that Mr. Baxter has been guilty of some one or

more of the acts enumerated in the prescribed oath, or rather in the *law* we are considering, (for the oath, as before stated, must be considered as incorporated in the body of the act,) the question then arises : Does this law of Congress render the act committed *punishable* in a manner in which it was not punishable when it *was* committed ? Does it affect him, by way of *punishment* of the act, either in his person or his estate, *differently* from what it would have done before the passage of the law, and at the time the act was committed ? If it does, then, under the authorities before cited, it is an *ex post facto* law, and, being repugnant to the Constitution, is void." And in the next paragraph the Judge says : " But this law *extends* the punishment of the attorney, by virtually depriving him of his office in the Courts, and thereby forfeiting whatever of the emoluments of his profession he may be entitled to upon contracts with his clients for services to be rendered, or which have been in part performed and not yet completed.   *   *   *   *   And the effect of the law being thus penal in its consequences, and *punishing* the attorney for the acts mentioned in the oath, in a manner in which they were *not* punishable, when committed, then, tested by the principles laid down in the Cases of Calder v. Bull and Fletcher v. Peck, I am constrained to declare that the Act in question is opposed to the Constitution of the United States, is *ex post facto* in its operations, and therefore not a valid law."   Pamph. 10.

BUSTEED, J., in *Shorter et. al., supra,* declared the Act to be "highly penal in its general scope and effect."   The Judge also determined it to be *ex post facto ;* and gave the following cogent illustration in support of his decision on this point : "One of the clauses in the act of Congress of the 2d of July, 1862, and which is embraced in the oath required by the act of January 24, 1865, is as follows : ' That I have neither sought, nor accepted, nor attempted to exercise the functions of any office whatever, under any authority, or pretended authority, in hostility to the United States.' This abjuration is not confined to any period.   It covers the life

time of the affirmant. Before the 24th of January, 1865, a British subject could be admitted to all the rights of citizenship in the United States by taking the oaths of naturalization. Without being naturalized, he might be admitted to the bar of this Court upon complying with the rules of the Court. But if, during the period of war between the United States and Great Britain, half a century ago, he had held office in the kingdom of which he was a native and was then a subject, he could not comply with the requisitions of this statute, and could no longer exercise his privilege as a member of the bar of this Court. The right acquired by his naturalization, and by the rules and orders of the Court, would be annulled by a law *ex post facto*, and for an act innocent, or even praiseworthy, when it was done."

It was likewise the opinion of the Court that the statute compelled the party to be a witness against himself. "It is unworthy of the great question," observed the Judge, "to say that a man is not obliged to put himself in the supposed dilemma; that all he has to do is not to attempt the practice of his profession in the National Courts, and he will not run the risk of testifying to his own guilt. This is the merest and the shallowest sophistry. If he keep silence, he is thereby deprived of a constitutional right; if he speak, he becomes a ' witness against himself.' Judgment of condemnation instantly follows the coerced acknowledgment of guilt, and an act of the legislature is thus made to take the place and exercise the functions of the judicial office. Now, if Congress may bring about such a result to a man, is it not doing, by indirection, what it is expressly prohibited from doing directly ?"

Concurring in the decision of the United States Circuit Court in the case of *Baxter*, and that of the United States District Court in *Shorter et. al.*, it might seem unnecessary to offer further or other argument on subjects which have already been so satisfactorily treated; but as the same questions which arose before those tribunals were also discussed

20

here, it is due to counsel that the views of this Court be signified; little, however, can be added.

In *Fletcher* v. *Peck*, 6 Cranch, 138, it was said by the Supreme Court of the United States that an *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed. "This definition," says KENT, "is distinguished for its comprehensive brevity and precision, and it extends to laws passed after the act, and affecting a person by way of punishment of that act, either in his person or estate." 1 Kent, 409. And the Supreme Judicial Court of Massachusetts, in *Ross'* case, say: "Adding a new punishment, or increasing the old one for the same offence, would be *ex post facto*." 2 Pick., 165. "*Ex post facto* laws relate to penal and criminal proceedings." 1 Kent, 409. Carefully observing the foregoing definitions, it may be said that an *ex post facto* law is a retroactive penal or criminal law, and no other.

The design and object of a law is to regulate conduct, to prescribe and fix a rule or guide for it; and, therefore, a law attempting to regulate past conduct undoes itself, and involves an inconsistency, a contradiction, and an absurdity. The attaching of a new or cumulative consequence to a past transaction does not regulate it, for a by-gone act is beyond the reach of regulation. Sir William BLACKSTONE says that all laws should be made "to commence *in futuro*, and be notified before their commencement, which is implied in the term 'prescribed.'"

There are several clauses, or divisions, in the retrospective portion of the oath; the first is as follows: "I do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof."

If a citizen of the United States, or an alien while he or his family and effects are under the protection of the government, voluntarily bears arms against the United States, it is a levying of war against them; and this is treason, the heaviest and most atrocious offense known to the law; it is

the sum of all crimes, for it is committed against the duty of allegiance.

By observing this clause, it cannot but be noticed that, although it is couched in negative language, it nevertheless implies, affirmatively, that the party taking the oath may have borne arms against the United States within the period during which he has been a citizen. He does not swear posis tively that he has not borne arms against the United States since he has been a citizen thereof; but, on the contrary, his oath is pregnant with the admission that he has; and so, by implication, he inculpates himself, and at the same moment exculpates himself by testifying that he did not commit it *voluntarily;* and thus, the facts and the law being blended, he swears to matter of law, or rather to a conclusion of law.

It is a well settled rule, and knows no exception, that an act done from compulsion or necessity is not a crime; but the *degree* of necessity that will excuse is often, however, a nice matter to decide. *Respublica* v. *McCarty*, 2 Dall., 85, *United States* v. *Vigol, id.* 346. 1 Russ. on Crimes, 664; 665; 1 Bishop on Criminal Law, secs. 441 to 448. Allison Crim. Law, 627, 673; 1 Hume Crim. Law, 50, 51. *The Argo*, 1 Gall. 150, 157. *The New York*, 3 Wheat. 59.

It is in evidence, as has been seen, that Mr. Law, the petitioner, fell within the 13th exception of the Proclamation of May 29th, 1865, and that he received and accepted a grant of pardon and amnesty from the President of the United States. This grant was inspected by the Court and declared to be a valid act, and that the recipient ought to have the full legal benefit of it.

Now, if this pardon, in addition to absolving the offence, also restores to him property, not judicially condemned to the United States, by parity of principle, it likewise restores to him his property, or right of property, in the fees and other emoluments accruing to him for professional services as an attorney, proctor, &c.

Suppose a member of the bar were indicted for treason,

because of his having levied war against the United States, and he brings into the Circuit Court before which he stands charged a pardon for the offence, and he pleads it in bar, or by other proper mode presents it for judgment on arraignment or during trial; or after verdict, in arrest of judgment; or after judgment, in bar of execution; and his plea or motion is allowed, and he goes without day, is not this the end? By this, are not all the effects and consequences of the crime discharged, and the party become a " new man "?

But, notwithstanding the accused has the benefit of the pardon adjudged to him by the Court, yet he cannot be permitted to appear and be heard in any Federal Court, unless he shall have taken and subscribed an oath, (which oath is already quoted,) the first clause, as already mention( d, is, in substance, that he has never voluntarily borne arms against the nation since he has been a citizen thereof. In this clause, as is perceived, is inclosed the fact that he did not voluntarily commit the very offence for which he stood indicted, or was arraigned, or tried, or adjudged, and which particular offence he himself, in open Court, by his plea, confessed he had committed *voluntarily*.

Surely the exacting of this oath is a punishment;—it effectually disenables all who have done any of the acts mentioned in the oath, though they have received and accepted a full pardon and amnesty for the offences; it is not a mere temporary suspension from the practice, but a disbarment—a perpetual exclusion from the national Courts. The Act punishes the party in a manner in which he was not punishable when the act was committed, and in a manner not conformable to the fundamental law of the land. The requirement of this oath brings its retrospective clauses directly within the ruling in *Ross'* case: "Adding a new punishment," said the Court, " or increasing an old one for the same offence, would be *ex post facto*."

Applying the principles advanced in the case supposed to this of the petitioner, the same results will be obtained.

In these remarks, I have touched upon the first clause

only—giving but one example—but, on examination of the others, it will be found that the same peculiarities pervade them as are inherent in the first, and that like results flow from them.

It may not be wholly foreign to notice the fact that, if the party required to take the oath be a native citizen of the United States, every word of the retrospective part of the oath would affect every hour of his past life.   2 Kent, 258 *note.*   4 Bla. Com., 23 ; *Boyd* v. *Banta,* Coxe, 266 ; 1 Russ. on Crimes, 1 to 10 ; 1 Bishop on Crim. Law, sec. 460, 461, 3d Ed.

Recurring briefly to the cases of *Leigh,* and *Dorsey,* and *Cohen* v. *Wright,,* it will be seen that in Leigh's case the law only required the attorney to swear that he had not transgressed the statute "since the passage thereof." Notwithstanding this oath may, perhaps, on strict construction, be deemed prospective, yet it was censured in strong language by a majority of the court.

In *Dorsey's* case, the oath to be taken was, not that the party had not violated the provisions of the statute since its enactment, but from a period prior thereto.   As already observed, a majority of the court decided the retroactive portion of this oath to be unconstitutional and void.

In *Cohen* v. *Wright,* the court expressed some doubt as to the validity of the oath (quoted in full in the former part of this opinion) "so far as it was a declaration of past conduct." But, it remarked : " The Act is not retrospective as it merely requires the party to swear that he has not committed any treasonable act *since* its passage." And near the close of the opinion it was said : " The law warned him what the result would be, and although it may be severe, it is a consequence of his own voluntary violation of the fundamental rights of society."

To require a person, under any circumstances, to take an oath of innocence of crime, even when he had warning by a pre-ordained law—and warning, it is said, is the end of punishment—is a rigid exaction.   Yet it was cautiously observ-

ed by the court, in the case last cited, in speaking of the oath before it, that "it seemed to go beyond the strict letter of the constitutional oath. * * * It however, does but carry out the object, design and spirit of the constitutional oath; and as it is not an unreasonable requirement, being confined to acts since the passage of the law, and does not clearly violate the constitution, we are unwilling to declare it void on a mere doubt."

But the particular question now before this Court, is of still greater importance, because the oath of expurgation required by the Act of Congress, approved January 24, 1865, goes back and searches the conscience of the petitioner, who is a native citizen, born in 1791, during the whole course of his life—retroacting upon him for a period little less than three-quarters of a century anterior to its passage by Congress.

That the imposing of the retrospective portions of this oath is virtually compulsory, and effectually punitive, cannot, in my judgment, be denied. It makes the party swear to a life long innocence, and to testify against himself; and herein it is also an infraction of the fundamental law of the land.

And while preparing this opinion, I have not been unmindful of the magnitude, nay, awfulness of the responsibility which devolves upon a Court in pronouncing against even a part of a solemn Act of the Congress of the United States.

### JUDGMENT.

Upon argument had on said motion of the petitioner, Mr. Law, and after full consideration of the matters of fact and of law involved, it is ordered and adjudged by the Court, that the Act of Congress, approved January twenty-fourth, eighteen hundred and sixty-five—so far as it was intended to apply to this case—is repugnant to the Constitution of the United States.

Motion granted.

*Savannah, May 31st,* 1866.