## UNITED STATES *v.* BROWN.

No. 399.  Argued March 29, 1965.—Decided June 7, 1965.

*Solicitor General Cox* argued the cause for the United States. With him on the brief were *Assistant Attorney General Yeagley, Nathan Lewin, Kevin T. Maroney* and *George B. Searls.*

*Richard Gladstein* argued the cause for respondent. With him on the brief was *Norman Leonard.*

Briefs of *amici curiae,* urging affirmance, were filed by *Melvin L. Wulf* for the American Civil Liberties Union of Northern California et al., and by *Victor Rabinowitz* and *Leonard B. Boudin* for the Emergency Civil Liberties Committee.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

In this case we review for the first time a conviction under § 504 of the Labor-Management Reporting and Disclosure Act of 1959, which makes it a crime for a member of the Communist Party to serve as an officer or (except in clerical or custodial positions) as an employee of a labor union.[1] Section 504, the purpose of which is to protect

---

[1] 73 Stat. 536, 29 U. S. C. § 504 (1958 ed., Supp. IV). The section, which took effect on September 14, 1959, provides, in pertinent part:

"(a) No person who is or has been a member of the Communist Party . . . shall serve—

"(1) as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, or other

the national economy by minimizing the danger of politi-
cal strikes,[2] was enacted to replace § 9 (h) of the National
Labor Relations Act, as amended by the Taft-Hartley
Act, which conditioned a union's access to the National
Labor Relations Board upon the filing of affidavits by all
of the union's officers attesting that they were not
members of or affiliated with the Communist Party.[3]

employee (other than as an employee performing exclusively clerical
or custodial duties) of any labor organization . . . .

    ·        ·        ·        ·        ·

"during or for five years after the termination of his membership
in the Communist Party . . . .

"(b) Any person who willfully violates this section shall be fined not
more than $10,000 or imprisoned for not more than one year, or both."

[2] In *American Communications Assn.* v. *Douds,* 339 U. S. 382, 388,
this Court found that "the purpose of § 9 (h) of the [National Labor
Relations] Act [was] to remove . . . the so-called 'political strike'."
Section 504 was designed to accomplish the same purpose as § 9 (h),
but in a more direct and effective way. H. R. Rep. No. 741, 86th
Cong., 1st Sess., p. 33; H. R. Rep. No. 1147, 86th Cong., 1st Sess.,
p. 36.

[3] 61 Stat. 146, amending the National Labor Relations Act of
1935, 49 Stat. 449. Section 9 (h) provided:

"No investigation shall be made by the Board of any question
affecting commerce concerning the representation of employees, raised
by a labor organization under subsection (c) of this section, no peti-
tion under section 9 (e)(1) shall be entertained, and no complaint
shall be issued pursuant to a charge made by a labor organization
under subsection (b) of section 10, unless there is on file with the
Board an affidavit executed contemporaneously or within the preced-
ing twelve-month period by each officer of such labor organization
and the officers of any national or international labor organization
of which it is an affiliate or constituent unit that he is not a member
of the Communist Party or affiliated with such party, and that he
does not believe in, and is not a member of or supports any organiza-
tion that believes in or teaches, the overthrow of the United States
Government by force or by any illegal or unconstitutional methods.
The provisions of section 35 A of the Criminal Code shall be applicable
in respect to such affidavits."

Section 9 (h) was repealed by § 201 (d) of the Labor-Management
Reporting and Disclosure Act of 1959, 73 Stat. 525.

Respondent has been a working longshoreman on the San Francisco docks, and an open and avowed Communist, for more than a quarter of a century. He was elected to the Executive Board of Local 10 of the International Longshoremen's and Warehousemen's Union for consecutive one-year terms in 1959, 1960, and 1961. On May 24, 1961, respondent was charged in a one-count indictment returned in the Northern District of California with "knowingly and wilfully serv[ing] as a member of an executive board of a labor organization . . . while a member of the Communist Party, in wilful violation of Title 29, United States Code, Section 504." It was neither charged nor proven that respondent at any time advocated or suggested illegal activity by the union, or proposed a political strike.[4] The jury found respondent guilty, and he was sentenced to six months' imprisonment. The Court of Appeals for the Ninth Circuit, sitting *en banc*, reversed and remanded with instructions to set aside the conviction and dismiss the indictment, holding that § 504 violates the First and Fifth Amendments to the Constitution. 334 F. 2d 488. We granted certiorari, 379 U. S. 899.

Respondent urges—in addition to the grounds relied on by the court below—that the statute under which he was convicted is a bill of attainder, and therefore violates Art. I, § 9, of the Constitution.[5] We agree that § 504 is void as a bill of attainder and affirm the decision of the Court of Appeals on that basis. We therefore find it unnecessary to consider the First and Fifth Amendment arguments.

---

[4] Evidence that the executive board had never called a strike was, upon the motion of the Government, stricken from the record, and a defense offer to prove that the union had not been involved in a strike since 1948 was rejected by the court.

[5] Respondent first raised the bill of attainder argument in his motion to dismiss the indictment.

## I.

The provisions outlawing bills of attainder were adopted by the Constitutional Convention unanimously, and without debate.[6]

"No Bill of Attainder or ex post facto Law shall be passed [by the Congress]." Art. I, § 9, cl. 3.

"No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ." Art. I, § 10.

A logical starting place for an inquiry into the meaning of the prohibition is its historical background. The bill of attainder, a parliamentary act sentencing to death one or more specific persons, was a device often resorted to in sixteenth, seventeenth and eighteenth century England for dealing with persons who had attempted, or threatened to attempt, to overthrow the government.[7] In addition to the death sentence, attainder generally carried with it a "corruption of blood," which meant that the attainted party's heirs could not inherit his property.[8] The "bill of pains and penalties" was identical to the bill of attainder, except that it prescribed a penalty short of death,[9] e. g., banishment,[10] deprivation of the right to

---

[6] Madison, Debates in the Federal Convention of 1787, p. 449 (Hunt and Scott ed. 1920).

[7] E. g., 3 Jac. 1, c. 2; 10 & 11 Will. 3, c. 13; 13 Will. 3, c. 3; 9 Geo. 1, c. 15.

[8] 3 Coke, First Institute (on Littleton), p. 565 (Thomas ed. 1818); Chafee, Three Human Rights in the Constitution of 1787, p. 96 (1956). Cf. U. S. Const., Art. III, § 3, cl. 2.

[9] II Wooddeson, A Systematical View of the Laws of England, p. 638 (1792); II Story, Commentaries on the Constitution of the United States, p. 210 (4th ed. 1873); see, e. g., 13 Car. 2, Stat. I, c. 15; 9 Geo. 1, c. 15.

[10] II Wooddeson, A Systematical View of the Laws of England, p. 638 (1792); see, e. g., 19 Car. 2, c. 10; Proceedings Against Hugh and Hugh Le Despencer, 1 State Trials 23 (1320).

vote,[11] or exclusion of the designated party's sons from Parliament.[12] Most bills of attainder and bills of pains and penalties named the parties to whom they were to apply; a few, however, simply described them.[13] While some left the designated parties a way of escaping the penalty, others did not.[14] The use of bills of attainder and bills of pains and penalties was not limited to England. During the American Revolution, the legislatures of all thirteen States passed statutes directed against the Tories; among these statutes were a large number of bills of attainder and bills of pains and penalties.[15]

While history thus provides some guidelines, the wide variation in form, purpose and effect of ante-Constitution bills of attainder indicates that the proper scope of the Bill of Attainder Clause, and its relevance to contemporary problems, must ultimately be sought by attempting to discern the reasons for its inclusion in the Constitution, and the evils it was designed to eliminate. The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature.

The Constitution divides the National Government into three branches—Legislative, Executive and Judicial.

---

[11] *E. g.*, 11 Geo. 3, c. 55.

[12] 21 Rich. 2, c. 6.

[13] *E. g.*, 26 Hen. 8, c. 25 (priv.), 3 Statutes of the Realm, p. 529; 8 Will. 3, c. 5.

[14] See note 32, *infra.*

[15] Van Tyne, The Loyalists in the American Revolution, apps. B & C (1902); Thompson, Anti-Loyalist Legislation During the American Revolution, 3 Ill. L. Rev. 81, 147; Reppy, The Spectre of Attainder in New York, 23 St. John's L. Rev. 1. See *Respublica v. Gordon*, 1 Dall. 233; *Cooper v. Telfair*, 4 Dall. 14.

This "separation of powers" was obviously not instituted with the idea that it would promote governmental efficiency. It was, on the contrary, looked to as a bulwark against tyranny. For if governmental power is fractionalized, if a given policy can be implemented only by a combination of legislative enactment, judicial application, and executive implementation, no man or group of men will be able to impose its unchecked will. James Madison wrote:

> "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." [16]

The doctrine of separated powers is implemented by a number of constitutional provisions, some of which entrust certain jobs exclusively to certain branches, while others say that a given task is *not* to be performed by a given branch. For example, Article III's grant of "the judicial Power of the United States" to federal courts has been interpreted both as a grant of exclusive authority over certain areas, *Marbury* v. *Madison,* 1 Cranch 137, and as a limitation upon the judiciary, a declaration that certain tasks are not to be performed by courts, *e. g.,* *Muskrat* v. *United States,* 219 U. S. 346. Compare *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579.

The authors of the Federalist Papers took the position that although under some systems of government (most notably the one from which the United States had just broken), the Executive Department is the branch most likely to forget the bounds of its authority, "in a representative republic . . . where the legislative power is exercised by an assembly . . . which is sufficiently numerous to feel all the passions which actuate a multitude; yet

---

[16] The Federalist, No. 47, pp. 373–374 (Hamilton ed. 1880).

not so numerous as to be incapable of pursuing the objects of its passions . . . ," barriers had to be erected to ensure that the legislature would not overstep the bounds of *its* authority and perform the functions of the other departments.[17] The Bill of Attainder Clause was regarded as such a barrier. Alexander Hamilton wrote:

"Nothing is more common than for a free people, in times of heat and violence, to gratify momentary passions, by letting into the government principles and precedents which afterwards prove fatal to themselves. Of this kind is the doctrine of disqualification, disfranchisement, and banishment by acts of the legislature. The dangerous consequences of this power are manifest. If the legislature can disfranchise any number of citizens at pleasure by general descriptions, it may soon confine all the votes to a small number of partisans, and establish an aristocracy or an oligarchy; if it may banish at discretion all those whom particular circumstances render obnoxious, without hearing or trial, no man can be safe, nor know when he may be the innocent victim of a prevailing faction. The name of liberty applied to such a government, would be a mockery of common sense." [18]

---

[17] The Federalist, No. 48, pp. 383–384 (Hamilton ed. 1880) (Madison); see generally The Federalist, Nos. 47 (Madison), 48 (Madison), 49 (Hamilton), 51 (Hamilton) and 78 (Hamilton).

[18] III (John C.) Hamilton, History of the Republic of the United States, p. 34 (1859), quoting Alexander Hamilton. James Madison expressed similar sentiments:

"Bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the state constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers

Thus the Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.

"Every one must concede that a legislative body, from its numbers and organization, and from the very intimate dependence of its members upon the people, which renders them liable to be peculiarly susceptible to popular clamor, is not properly constituted to try with coolness, caution, and impartiality a criminal charge, especially in those cases in which the popular feeling is strongly excited,—the very class of cases most likely to be prosecuted by this mode." [19]

ought not to be omitted. Very properly, therefore, have the convention added this constitutional bulwark in favour of personal security and private rights . . . . The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret and with indignation, that sudden changes, and legislative interferences, in cases affecting personal rights, become jobs in the hands of enterprising and influential speculators; and snares to the more industrious and less informed part of the community." The Federalist, No. 44, p. 351 (Hamilton ed. 1880).

[19] 1 Cooley, Constitutional Limitations, pp. 536–537 (8th ed. 1927). To the same effect, see *Calder* v. *Bull*, 3 Dall. 386, 389; *United States* v. *Lovett*, 328 U. S. 303, 317–318; II Story, Commentaries on the Constitution of the United States, p. 210 (4th ed. 1873); III Hamilton, History of the Republic of the United States, p. 31 (1859); Pound, Justice According to Law II, 14 Col. L. Rev. 1, 7–12. Macaulay's account of the attainder of Sir John Fenwick is particularly vivid:

"Some hundreds of gentlemen, every one of whom had much more than half made up his mind before the case was open, performed the office both of judge and jury. They were not restrained, as a judge is restrained, by the sense of responsibility . . . . They were not selected,

By banning bills of attainder, the Framers of the Constitution sought to guard against such dangers by limiting legislatures to the task of rule-making. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck,* 6 Cranch 87, 136.[20]

---

as a jury is selected, in a manner which enables a culprit to exclude his personal and political enemies. The arbiters of the prisoner's fate came in and went out as they chose. They heard a fragment here and there of what was said against him, and a fragment here and there of what was said in his favor. During the progress of the bill they were exposed to every species of influence. One member might be threatened by the electors of his borough with the loss of his seat . . . . In the debates arts were practised and passions excited which are unknown to well-constituted tribunals, but from which no great popular assembly divided into parties ever was or ever will be free." IX Macaulay, History of England, p. 207 (1900).

[20] The same thought is reflected in the writings of Thomas Jefferson: "173 despots would surely be as oppressive as one. . . . [L]ittle will it avail us that they are chosen by ourselves. . . . [T]he government we fought for [is] one which should not only be founded on free principles, but in which the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others. For this reason that convention, which passed the ordinance of government, laid its foundation on this basis, that the legislative, executive and judiciary departments should be separate and distinct, so that no person should exercise the powers of more than one of them at the same time. . . . If . . . the legislature assumes executive and judiciary powers, no opposition is likely to be made; nor, if made, can it be effectual; because in that case they may put their proceedings into the form of an act of assembly, which will render them obligatory on the other branches. *They have accordingly in many instances, decided rights which should have been left to judiciary controversy . . . .*" Jefferson, Notes on the State of Virginia, pp. 157–158 (Ford ed. 1894). (Emphasis supplied.)

## II.

It is in this spirit that the Bill of Attainder Clause was consistently interpreted by this Court—until the decision in *American Communications Assn.* v. *Douds*, 339 U. S. 382, which we shall consider hereafter. In 1810, Chief Justice Marshall, speaking for the Court in *Fletcher* v. *Peck*, 6 Cranch 87, 138, stated that "[a] bill of attainder may affect the life of an individual, or may confiscate his property, or may do both." This means, of course, that what were known at common law as bills of pains and penalties are outlawed by the Bill of Attainder Clause. The Court's pronouncement therefore served notice that the Bill of Attainder Clause was not to be given a narrow historical reading (which would exclude bills of pains and penalties), but was instead to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups. See also *Ogden* v. *Saunders,* 12 Wheat. 213, 286.

The approach which Chief Justice Marshall had suggested was followed in the twin post-Civil War cases of *Cummings* v. *Missouri,* 4 Wall. 277, and *Ex parte Garland,* 4 Wall. 333. *Cummings* involved the constitutionality of amendments to the Missouri Constitution of 1865 which provided that no one could engage in a number of specified professions (Cummings was a priest) unless he first swore that he had taken no part in the rebellion against the Union. At issue in *Garland* was a federal statute which required attorneys to take a similar oath before they could practice in federal courts. This Court struck down both provisions as bills of attainder on the ground that they were legislative acts inflicting punishment on a specific group: clergymen and lawyers who had taken part in the rebellion and therefore could not truthfully take the oath. In reaching its result, the Court emphatically rejected the argument that the con-

stitutional prohibition outlawed only a certain class of legislatively imposed penalties:

> "The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment." 4 Wall., at 320.

The next extended discussion of the Bill of Attainder Clause [21] came in 1946, in *United States* v. *Lovett*, 328 U. S. 303, where the Court invalidated § 304 of the Urgent Deficiency Appropriation Act, 1943, 57 Stat. 431, 450, which prohibited payment of further salary to three named federal employees,[22] as a bill of attainder.

> "[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascer-

---

[21] In 1872, in *Pierce* v. *Carskadon*, 16 Wall. 234, the Court voided as a bill of attainder a West Virginia statute conditioning access to the courts upon the taking of an oath similar to those involved in *Cummings* and *Garland*. In *Dent* v. *West Virginia*, 129 U. S. 114, this Court upheld a West Virginia statute requiring that physicians obtain a license in order to practice. Appellant argued, *inter alia*, that the statute was a bill of attainder because the granting of a license was conditioned upon graduating from medical school, practicing for 10 years, or passing a special examination. The Court rejected the argument on the ground that the statute set forth general qualifications applicable to all persons who wanted to practice medicine, *id.*, at 124, and did not single out a specific person or group for deprivation. See also *Drehman* v. *Stifle*, 8 Wall. 595.

[22] Section 304 provided:

"No part of any appropriation, allocation, or fund (1) which is made available under or pursuant to this Act, or (2) which is now, or which

tainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution. . . . This permanent proscription from any opportunity to serve the Government is punishment, and of a most severe type. . . . No one would think that Congress could have passed a valid law, stating that after investigation it had found Lovett, Dodd, and Watson 'guilty' of the crime of engaging in 'subversive activities,' defined that term for the first time, and sentenced them to perpetual exclusion from any government employment. Section 304, while it does not use that language, accomplishes that result." *Id.*, at 315–316.[23]

### III.

Under the line of cases just outlined, § 504 of the Labor-Management Reporting and Disclosure Act plainly constitutes a bill of attainder. Congress undoubtedly possesses power under the Commerce Clause to enact

---

is hereafter made, available under or pursuant to any other Act, to any department, agency, or instrumentality of the United States, shall be used, after November 15, 1943, to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Junior, and Robert Morss Lovett, unless prior to such date such person has been appointed by the President, by and with the advice and consent of the Senate: *Provided,* That this section shall not operate to deprive any such person of payment for leaves of absence or salary, or of any refund or reimbursement, which have accrued prior to November 15, 1943 . . . ."

[23] Although it may be that underinclusiveness is a characteristic of most bills of attainder, we doubt that it is a necessary feature. We think it clear from the *Lovett* opinion that § 304 would have been voided even if it could have been demonstrated that no one other than Lovett, Watson and Dodd possessed the characteristics which Congress was trying to reach. The vice of attainder is that the legislature has decided for itself that certain persons possess certain characteristics and are therefore deserving of sanction, not that it has failed to sanction others similarly situated.

legislation designed to keep from positions affecting inter-state commerce persons who may use such positions to bring about political strikes. In § 504, however, Congress has exceeded the authority granted it by the Constitution. The statute does not set forth a generally applicable rule decreeing that any person who commits certain acts or possesses certain characteristics (acts and character-istics which, in Congress' view, make them likely to initiate political strikes) shall not hold union office, and leave to courts and juries the job of deciding what per-sons have committed the specified acts or possess the specified characteristics. Instead, it designates in no un-certain terms the persons who possess the feared charac-teristics and therefore cannot hold union office without incurring criminal liability—members of the Communist Party.[24]

*Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, lends support to our conclusion. That case involved an appeal from an order by the Control Board ordering the Communist Party to register as a "Communist-action organization," under the Subversive Activities Control Act of 1950, 64 Stat. 987, 50 U. S. C. § 781 *et seq.* (1958 ed.). The definition of "Communist-action organization" which the Board is to apply is set forth in § 3 of the Act:

> "[A]ny organization in the United States . . . which (i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement re-ferred to in section 2 of this title, and (ii) operates primarily to advance the objectives of such world

---

[24] We of course take no position on whether or not members of the Communist Party are in fact likely to incite political strikes. The point we make is rather that the Constitution forbids Congress from making such determinations.

Communist movement . . . ." 64 Stat. 989, 50 U. S. C. § 782 (1958 ed.).

A majority of the Court rejected the argument that the Act was a bill of attainder, reasoning that § 3 does not specify the persons or groups upon which the deprivations set forth in the Act are to be imposed, but instead sets forth a general definition. Although the Board had determined in 1953 that the Communist Party was a "Communist-action organization," the Court found the statutory definition not to be so narrow as to insure that the Party would always come within it:

> "In this proceeding the Board has found, and the Court of Appeals has sustained its conclusion, that the Communist Party, by virtue of the activities in which it now engages, comes within the terms of the Act. If the Party should at any time choose to abandon these activities, after it is once registered pursuant to § 7, the Act provides adequate means of relief." 367 U. S., at 87.

The entire Court did not share the view of the majority that § 3's definition constituted rule-making rather than specification.[25] See also *Garner* v. *Los Angeles Board,* 341 U. S. 716, 723. However, language incorporated in the majority opinion indicates that there was agreement on one point: by focusing upon "the crucial constitutional significance of what Congress did when it rejected the approach of outlawing the Party by name and accepted instead a statutory program regulating not enumerated organizations but designated activities," 367 U. S., at 84–85, the majority clearly implied that if the Act had applied to the Communist Party by name, it would have been a bill of attainder:

> "The Act is not a bill of attainder. It attaches not to specified organizations but to described activities

---

[25] See 367 U. S., at 146 (BLACK, J., dissenting).

in which an organization may or may not engage. . . . The Subversive Activities Control Act . . . requires the registration only of organizations which, after the date of the Act, are found to be under the direction, domination, or control of certain foreign powers and to operate primarily to advance certain objectives. This finding must be made after full administrative hearing, subject to judicial review which opens the record for the reviewing court's determination whether the administrative findings as to fact are supported by the preponderance of the evidence." *Id.*, at 86–87.[26]

In this case no disagreement over whether the statute in question designates a particular organization can arise, for § 504 in terms inflicts its disqualification upon members of the Communist Party. The moment § 504 was enacted, respondent was given the choice of declining a leadership position in his union or incurring criminal liability.

---

[26] "It need hardly be said that it is upon the particular evidence in a particular record that a particular defendant must be judged, and not upon the evidence in some other record or upon what may be supposed to be the tenets of the Communist Party." *Noto* v. *United States,* 367 U. S. 290, 299.

It is argued that § 504 is not a bill of attainder because prior to its enactment there had been an administrative adjudication (by the Subversive Activities Control Board) of "the nature of the Party." Compare *Hawker* v. *New York,* 170 U. S. 189; *DeVeau* v. *Braisted,* 363 U. S. 144, 160. Even leaving aside the fact that the legislative history of § 504, see note 2, *supra,* indicates that Congress was acting in reliance on the findings it had made in 1947 rather than on those made by the Board in 1953, we think that this argument misses the point of the Court's opinion in the *Communist Party* case, where the Court stressed that the Subversive Activities Control Act did not name the Communist Party but rather set forth a broad definition, which would permit the Party to escape the prescribed deprivations in the event its character changed.

The Solicitor General points out that in *Board of Governors* v. *Agnew*, 329 U. S. 441, this Court applied § 32 of the Banking Act of 1933, which provides:

> "No officer, director, or employee of any corporation or unincorporated association, no partner or employee of any partnership, and no individual, primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds, or other similar securities, shall serve the same time as an officer, director, or employee of any member bank except in limited classes of cases in which the Board of Governors of the Federal Reserve System may allow such service by general regulations when in the judgment of the said Board it would not unduly influence the investment policies of such member bank or the advice it gives its customers regarding investments." [27]

He suggests that for purposes of the Bill of Attainder Clause, such conflict-of-interest laws [28] are not meaningfully distinguishable from the statute before us. We find this argument without merit. First, we note that § 504, unlike § 32 of the Banking Act, inflicts its deprivation upon the members of a political group thought to present a threat to the national security. As we noted above, such groups were the targets of the overwhelming majority of English and early American bills of attainder. Second, § 32 incorporates no judgment censuring or con-

---

[27] 48 Stat. 194, as amended, 49 Stat. 709, 12 U. S. C. § 78 (1964 ed.).

[28] A similar example is furnished by provisions forbidding state officers or employees from concurrently holding certain other types of positions, such as positions with the Federal Government. See, e. g., Cal. Const., Art. IV, § 20; cf. N. Y. Const., Art. III, § 7; U. S. Const., Art I, § 6, cl. 2.

demning any man or group of men. In enacting it, Congress relied upon its general knowledge of human psychology, and concluded that the concurrent holding of the two designated positions would present a temptation to *any* man—not just certain men or members of a certain political party. Thus insofar as § 32 incorporates a condemnation, it condemns all men. Third, we cannot accept the suggestion that § 32 constitutes an exercise in specification rather than rule-making. It seems to us clear that § 32 establishes an objective standard of conduct. Congress determined that a person who both (a) held a position in a bank which could be used to influence the investment policies of the bank or its customers, and (b) was in a position to benefit financially from investment in the securities handled by a particular underwriting house, might well be tempted to "use his influence in the bank to involve it or its customers in securities which his underwriting house has in its portfolio or has committed itself to take." 329 U. S., at 447. In designating bank officers, directors and employees as those persons in position (a), and officers, directors, partners and employees of underwriting houses as those persons in position (b), Congress merely expressed the characteristics it was trying to reach in an alternative, shorthand way.[29] That Congress was legislating with

---

[29] The command of the Bill of Attainder Clause—that a legislature can provide that persons possessing certain characteristics must abstain from certain activities, but must leave to other tribunals the task of deciding who possesses those characteristics—does not mean that a legislature cannot use a shorthand phrase to summarize the characteristics with which it is concerned. For example, a legislature might determine that persons afflicted with a certain disease which has as one of its symptoms a susceptibility to uncontrollable seizures should not be licensed to operate dangerous machinery. In enacting a statute to achieve this goal, the legislature could name the disease instead of listing the symptoms, for in doing so it would merely be substituting a shorthand phrase which conveys the same meaning.

respect to general characteristics rather than with respect to a specific group of men is well demonstrated by the fact that § 32 provides that the prescribed disqualification should not obtain whenever the Board of Governors determined that "it would not unduly influence the investment policies of such member bank or the advice it gives its customers regarding investments." We do not suggest that such an escape clause is essential to the constitutionality of § 32, but point to it only further to underscore the infirmity of the suggestion that § 32, like § 504, incorporates an empirical judgment of, and inflicts its deprivation upon, a particular group of men.

It is argued, however, that in § 504 Congress did no more than it did in enacting § 32: it promulgated a general rule to the effect that persons possessing characteristics which make them likely to incite political strikes should not hold union office, and simply inserted in place of a list of those characteristics an alternative, shorthand criterion—membership in the Communist Party. Again, we cannot agree. The designation of Communists as those persons likely to cause political strikes is not the substitution of a semantically equivalent phrase; on the contrary, it rests, as the Court in *Douds* explicitly recognized, 339 U. S., at 389, upon an empirical investigation by Congress of the acts, characteristics and propensities of Communist Party members. In a number of decisions, this Court has pointed out the fallacy of the suggestion that membership in the Communist Party, or any other political organization, can be regarded as an alternative, but equivalent, expression for a list of undesirable characteristics. For, as the Court noted in *Schneiderman* v. *United States,* 320 U. S. 118, 136, "under our traditions beliefs are personal and not a matter of mere association, and . . . men in adhering to a political party or other organization notoriously do not subscribe un-

qualifiedly to all of its platforms or asserted principles." [30]
Just last Term, in *Aptheker* v. *Secretary of State,* 378
U. S. 500, we held § 6 of the Subversive Activities Con-
trol Act to violate the Constitution because it "too broadly
and indiscriminately" restricted constitutionally protected
freedoms. One of the factors which compelled us to reach
this conclusion was that § 6 inflicted its deprivation upon
all members of Communist organizations without regard
to whether there existed any demonstrable relationship
between the characteristics of the person involved and the
evil Congress sought to eliminate. *Id.,* at 509–511.
These cases are relevant to the question before us. Even
assuming that Congress had reason to conclude that some
Communists would use union positions to bring about
political strikes, "it cannot automatically be inferred
that all members shar[e] their evil purposes or partici-
pat[e] in their illegal conduct." *Schware* v. *Board of
Bar Examiners,* 353 U. S. 232, 246. In utilizing the term
"members of the Communist Party" to designate those
persons who are likely to incite political strikes, it plainly
is not the case that Congress has merely substituted a
convenient shorthand term for a list of the characteristics
it was trying to reach.[31]

### IV.

The Solicitor General argues that § 504 is not a bill of
attainder because the prohibition it imposes does not con-
stitute "punishment." In support of this conclusion, he
urges that the statute was enacted for preventive rather

---

[30] To the same effect, see *Noto* v. *United States,* 367 U. S. 290,
299–300; *Wieman* v. *Updegraff,* 344 U. S. 183, 190.

[31] We rely on the "overbroadness" cases only to buttress our con-
clusion that § 504 cannot be rationalized on the ground that member-
ship in the Communist Party is merely an equivalent, shorthand way
of expressing those characteristics which render likely the incitement
of political strikes. We of course do not hold that overbroadness
is a necessary characteristic of a bill of attainder.

than retributive reasons—that its aim is not to punish Communists for what they have done in the past, but rather to keep them from positions where they will in the future be able to bring about undesirable events. He relies on *American Communications Assn.* v. *Douds,* 339 U. S. 382, which upheld § 9 (h) of the National Labor Relations Act, the predecessor of the statute presently before us. In *Douds* the Court distinguished *Cummings, Garland* and *Lovett* on the ground that in those cases

> "the individuals involved were in fact being punished for *past* actions; whereas in this case they are subject to possible loss of position only because there is substantial ground for the congressional judgment that their beliefs and loyalties will be transformed into *future* conduct." *Id.,* at 413.

This case is not necessarily controlled by *Douds.* For to prove its assertion that § 9 (h) was preventive rather than retributive in purpose,[32] the Court in *Douds* focused

---

[32] The Court's opinion in *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, 88, also referred to the fact that the members of the class affected by the statute could extricate themselves from the class at will. However, whereas the factor of escapability was considered in *Douds* to be probative of whether or not the statute was punitive, in the *Communist Party* case it was considered only as one factor tending to show that the Act in question was not directed at a specific group of persons but rather set forth a generally applicable definition. See note 26, *supra.* We do not read either opinion to have set up inescapability as an absolute prerequisite to a finding of attainder. Such an absolute rule would have flown in the face of explicit precedent, *Cummings* v. *Missouri,* 4 Wall. 277, 324, as well as the historical background of the constitutional prohibition. A number of ante-Constitution bills of attainder inflicted their deprivations upon named or described persons or groups, but offered them the option of avoiding the deprivations, *e. g.,* by swearing allegiance to the existing government. See, *e. g.,* Del. Laws 1778, c. 29b; Mass. Acts of September 1778, c. 13; III Hamilton, History of the Republic of the United States, p. 25 (1859); see generally Note, 72 Yale L. J. 330, 339–340.

on the fact that members of the Communist Party could escape from the class of persons specified by Congress simply by resigning from the Party:

"Here the intention is to forestall future dangerous acts; there is no one who may not, by a voluntary alteration of the loyalties which impel him to action, become eligible to sign the affidavit. We cannot conclude that this section is a bill of attainder." *Id.*, at 414.

Section 504, unlike § 9 (h), disqualifies from the holding of union office not only present members of the Communist Party, but also anyone who has within the past five years been a member of the Party. However, even if we make the assumption that the five-year provision was inserted not out of desire to visit retribution but purely out of a belief that failure to include it would lead to *pro forma* resignations from the Party which would not decrease the threat of political strikes, it still clearly appears that § 504 inflicts "punishment" within the meaning of the Bill of Attainder Clause. It would be archaic to limit the definition of "punishment" to "retribution." Punishment serves several purposes: retributive, rehabilitative, deterrent—and preventive. One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment.

Historical considerations by no means compel restriction of the bill of attainder ban to instances of retribution. A number of English bills of attainder were enacted for preventive purposes—that is, the legislature made a judgment, undoubtedly based largely on past acts and associations (as § 504 is)[33] that a given person or group was likely to cause trouble (usually, overthrow the

---

[33] *American Communications Assn.* v. *Douds*, 339 U. S. 382, 389; see note 2, *supra*.

government) and therefore inflicted deprivations upon that person or group in order to keep it from bringing about the feared event.[34]   It is also clear that many of the early American bills attainting the Tories were passed in order to impede their effectively resisting the Revolution.

"In the progress of the conflict, and particularly in its earliest periods, attainder and confiscation had been resorted to generally, throughout the continent, as a means of war.   But it is a fact important to the history of the revolting colonies, that the acts prescribing penalties, usually offered to the persons against whom they were directed the option of avoiding them, by acknowledging their allegiance to the existing governments.

"It was a preventive, not a vindictive policy. In the same humane spirit, as the contest approached its close, and the necessity of these severities diminished, many of the states passed laws offering pardons

---

[34] See *Ex parte Law,* 15 Fed. Cas. 3, 9–10 (No. 8126) (D. C. S. D. Ga. 1866).   Professor Chafee has pointed out that even the death penalty was often inflicted largely for preventive purposes:

"There was no good middle ground between beheading and doing nothing.   If the ousted adviser were left at liberty, he could readily turn his resentment into coercion or rebellion and make a magnificent comeback to the utter ruin of those who had driven him from his high place.   Therefore, the usual object of Parliamentary proceedings against an important minister was to put him to death."   Chafee, Three Human Rights in the Constitution of 1787, pp. 103–104 (1956).

The preventive purpose of the "Act for the Attainder of the pretended Prince of Wales of High Treason" of 1700, 13 Will. 3, c. 3, is demonstrated by the parliamentary declaration that anyone corresponding with the Prince or his followers would be subject to prosecution for treason.   See also Chafee, *supra,* pp. 109–113 (impeachment and attainder of the Earl of Strafford), 115–118 (bill against the Earl of Clarendon).

to those who had been disfranchised, and restoring them to the enjoyment of their property . . . ." [35]

Thus Justice Iredell was on solid historical ground when he observed, in *Calder* v. *Bull,* 3 Dall. 386, 399–400, that "attainders, *on the principle of retaliation and proscription,* have marked all the vicissitudes of party triumph." (Emphasis supplied.)

We think that the Court in *Douds* misread *United States* v. *Lovett* when it suggested, 339 U. S., at 413, that that case could be distinguished on the ground that the sanction there imposed was levied for purely retributive reasons. In *Lovett* the Court, after reviewing the legislative history of § 304 of the Urgent Deficiency Appropriation Act, 328 U. S., at 308–313, concluded that the statute was the product of a congressional drive to oust from government persons whose (congressionally determined) "subversive" tendencies made their continued employment dangerous to the national welfare: "the purpose of all who sponsored § 304 . . . clearly was to 'purge' the then existing and all future lists of government employees of those whom Congress deemed guilty of 'subversive activities' and therefore 'unfit' to hold a federal job." *Id.,* at 314. Similarly, the purpose of the statute before us is to purge the governing boards of labor unions of those whom Congress regards as guilty of subversive acts and associations and therefore unfit to fill positions which might affect interstate commerce. [36]

---

[35] III Hamilton, History of the Republic of the United States, p. 25 (1859); see, *e. g.,* Mass. Acts of September 1778, c. 13 ("An Act to Prevent the Return of Tories"); cf. Md. Laws February 1777, c. 20 ("An Act to punish certain crimes and misdemeanors, and to prevent the growth of toryism"); see also II Story, Commentaries on the Constitution of the United States, p. 211, n. 1 (4th ed. 1873); authorities cited note 15, *supra.*

[36] Nor do the deprivations imposed by the two statutes differ in any meaningful way. Section 304 cut off the salary of the specified individuals, thereby effectively barring them from government serv-

The Solicitor General urges us to distinguish *Lovett* on the ground that the statute struck down there "singled out three identified individuals." It is of course true that § 504 does not contain the words "Archie Brown," and that it inflicts its deprivation upon more than three people. However, the decisions of this Court, as well as the historical background of the Bill of Attainder Clause, make it crystal clear that these are distinctions without a difference. It was not uncommon for English acts of attainder to inflict their deprivations upon relatively large groups of people,[37] sometimes by description rather than name.[38] Moreover, the statutes voided in *Cummings* and *Garland* were of this nature.[39] We cannot agree that the fact that § 504 inflicts its deprivation upon the membership of the Communist Party rather than upon a list of named individuals takes it out of the category of bills of attainder.

We do not hold today that Congress cannot weed dangerous persons out of the labor movement, any more than the Court held in *Lovett* that subversives must be permitted to hold sensitive government positions. Rather, we make again the point made in *Lovett:* that Congress must accomplish such results by rules of general applicability. It cannot specify the people upon whom the sanction it prescribes is to be levied. Under our Constitution, Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals.

---

ice, 328 U. S., at 316; § 504 provides that specified persons cannot serve as officers of, or engage in most kinds of employment with, labor unions. Compare Del. Laws 1778, c. 29b; *Cummings* v. *Missouri,* 4 Wall. 277, 317, 320; *Ex parte Garland,* 4 Wall. 333, 374.

[37] *E. g.,* 12 Car. 2, c. 30; 19 Geo. 2, c. 26; 11 Geo. 3, c. 55.

[38] Note 13, *supra.*

[39] See also *Ex parte Law,* 15 Fed. Cas. 3, 8 (No. 8126) (D. C. S. D. Ga. 1866); *United States v. Lovett,* 328 U. S. 303, 327 (Frankfurter, J., concurring).

This Court is always reluctant to declare that an Act of Congress violates the Constitution, but in this case we have no alternative. As Alexander Hamilton observed:

"By a limited constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex post facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." [40]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE CLARK, MR. JUSTICE HARLAN, and MR. JUSTICE STEWART join, dissenting.

"A bill of attainder is a legislative act which inflicts punishment without a judicial trial." *Cummings* v. *Missouri,* 4 Wall. 277, 323. When an enactment is challenged as an attainder, the central inquiry must be whether the disability imposed by the act is "punishment" (*i. e.,* is directed at an individual or a group of individuals) or is "regulation" (*i. e.,* is directed at controlling future conduct). *Flemming* v. *Nestor,* 363 U. S. 603, at 613–614; accord, *Trop* v. *Dulles,* 356 U. S. 86, 95–96 (WARREN, C. J., announcing judgment). Whether a punitive purpose would be inferred has depended in past cases on a number of circumstances, including the nature of the disability, whether it was traditionally regarded as punishment, whether it is rationally connected to a permissible legislative objective, as well as the specificity of the legisla-

---

[40] The Federalist, No. 78, pp. 576–577 (Hamilton ed. 1880).

ture's designation of the persons to be affected. See generally *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 168–169.

In this case, however, the Court discards this meticulous multifold analysis that has been deemed necessary in the past. Instead the Court places the burden of separating attainders from permissible regulation on an examination of the legislative findings implied by the nature of the class designated. The Bill of Attainder Clause, the Court says, was intended to implement the separation of powers by confining the legislature to rule-making and preventing legislative invasion of a function left exclusively to the courts—fact-finding connected with applications of a general rule to individuals or groups. Section 504 of the Labor-Management Reporting and Disclosure Act is therefore a bill of attainder because in pursuit of its purpose of preventing political strikes, it has specified the persons—Communist Party members—who are to be disqualified from holding union office, rather than excluding all persons who might engage in the undesirable conduct. The vice in § 504 is that it does not set forth a rule generally applicable to "any person who commits certain acts or possesses certain characteristics (acts and characteristics which, in Congress' view, make them likely to initiate political strikes)" but has instead designated "the persons who possess the feared characteristics," members of the Communist Party. *Ante,* at 450.

At this point the Court implies that legislation is sufficiently general if it specifies a characteristic that makes it *likely* that individuals falling within the group designated will engage in conduct Congress may prohibit. But the Court then goes on to reject the argument that Communist Party membership is in itself a characteristic raising such a likelihood. The Court declares that "[e]ven assuming that Congress had reason to conclude that *some* Communists would use union positions to bring about

political strikes, '. . . it cannot automatically be inferred that *all* members shar[e] their evil purposes or participat[e] in their illegal conduct.' " *Ante,* at 456. (Emphasis added.) This sudden shift in analysis—from likelihood to certainty—must mean that the Bill of Attainder Clause proscribes legislative action with respect to any group smaller than the total class possessing the characteristic upon which legislative power is premised whenever the legislation is based only on a finding about the average characteristics of the subgroup. The legislature may focus on a particular group or class only when the group designation is a "shorthand phrase" for the feared characteristic—*i. e.,* when it is common knowledge that all, not just some, members of the group possess the feared characteristic and thus such legislative designation would require no legislative fact-finding about individuals.[1]

In the Court's view, therefore, § 504 is too narrow in specifying the particular class; but it is also too broad in treating all members of the class alike. On both counts—underinclusiveness and overinclusiveness—§ 504 is invalid as a bill of attainder because Congress has engaged in forbidden fact-finding about individuals and groups and has thus strayed into the area reserved to the judiciary by the Constitution.

### I.

It is not difficult to find some of the cases and statutes which the necessary implications of the Court's approach will overrule or invalidate.

*American Communications Assn.* v. *Douds,* 339 U. S. 382, which upheld the predecessor statute to § 504 is ob-

---

[1] An overbroadness challenge could also be made under the First Amendment on the ground that in § 504 Congress has too broadly and indiscriminately visited disabilities on a class defined in terms of associational ties. See *Aptheker* v. *Secretary of State,* 378 U. S. 500. But the Court expressly disavows decision of First Amendment claims, and I likewise put such questions aside.

viously overruled. In that case the Court accepted the congressional findings about the Communist Party and about the propensity of Party members "to subordinate legitimate trade union objectives to obstructive strikes when dictated by Party leaders, often in support of the policies of a foreign government." 339 U. S., at 388. Moreover, Congress was permitted to infer from a person's "political affiliations and beliefs" that such a person would be likely to instigate political strikes. 339 U. S., at 391–392. Like § 504, the statute there under consideration did not cover all persons who might be likely to call political strikes. Nevertheless, legislative findings that *some* Communists would engage in illegal activities were sufficient to sustain the exercise of legislative power. The Bill of Attainder Clause now forbids Congress to do precisely what was validated in *Douds*.

Similarly invalidated are statutes denying positions of public importance to groups of persons identified by their business affiliations, commonly known as conflict-of-interest statutes. In the *Douds* case the Court found in such statutes support for its conclusion that Congress could rationally draw inferences about probable conduct on the basis of political affiliations and beliefs, which it considered comparable to business affiliations. The majority in the case now before us likewise recognizes the pertinency of such statutes and, in its discussion of *Board of Governors* v. *Agnew,* 329 U. S. 441, strenuously—and unsuccessfully—attempts to distinguish them.

The statute involved in *Agnew,* § 32 of the Banking Act of 1933, 48 Stat. 194, as amended, 12 U. S. C. § 78 (1964 ed.), forbade any partner or employee of a firm primarily engaged in underwriting securities from being a director of a national bank. The Court expressly recognized that the statute was directed to the *"probability or likelihood"* that a bank director who was also a partner or employee of an underwriting firm *"may* use his influence in the bank

to involve it or its customers in securities which his underwriting house has in its portfolio or has committed itself to take." 329 U. S., at 447. (Emphasis added.) And, as we noted in *Douds,* 339 U. S., at 392, "[t]here was no showing, nor was one required, that all employees of underwriting firms would engage in such conduct." See also *Agnew,* 329 U. S., at 449.

In terms of the Court's analysis of the Bill of Attainder Clause, no meaningful distinction may be drawn between § 32 of the Banking Act and § 504. Both sections disqualify a specifically described group, officers and employees of underwriting firms in the one case and members of the Communist Party in the other. Both sections may be said to be underinclusive: others besides underwriters may have business interests conflicting with the duties of a bank director and others than Communists may call political strikes. Equally, both sections may be deemed overinclusive: neither section finds that all members of the group affected would violate their obligations to the office from which they are disqualified; some members would and perhaps others would not. Both sections are based on a probability or likelihood that this would occur. Both sections leave to the courts the task of determining whether particular persons are members of the designated groups and occupy the specified positions.

In attempting to distinguish the two sections, the Court states that in enacting § 32 of the Banking Act Congress made no judgment or condemnation of any specific group of persons. Instead, the Court reasons, "Congress relied upon its general knowledge of human psychology, and concluded that the concurrent holding of the two designated positions would present a temptation to *any* man—not just certain men or members of a certain political party." *Ante,* at 454. But § 32 disqualifies only partners and employees of underwriting firms, not other

businessmen with conflicting interests. And § 504 applies to *any* man who occupies the two positions of labor union leader and member of the Communist Party. If based upon "its general knowledge of human psychology" Congress may make findings about a group including members and employees of underwriting firms which disqualify such persons from a certain office, why may not Congress on a similar basis make such a finding about members of the Communist Party? "Because of their business connections, carrying as they do certain loyalties, interests and disciplines," § 32 disqualifies members and employees of underwriting firms as posing "a continuing threat of participation in the harmful activities . . . ." *Douds,* 339 U. S., at 392. The same might be said about § 504, as was said about its predecessor: "Political affiliations of the kind here involved, no less than business affiliations, provide rational ground for the legislative judgment that those persons proscribed by § 9 (h) would be subject to 'tempting opportunities' to commit acts deemed harmful to the national economy. In this respect, § 9 (h) is not unlike a host of other statutes which prohibit specified groups of persons from holding positions of power and public interest because, in the legislative judgment, they threaten to abuse the trust that is a necessary concomitant of the power of office." *Id.,* at 392.

Conflict-of-interest statutes are an accepted type of legislation.[2] Indeed, our Constitution contains a con-

---

[2] See, *e. g.,* § 10 of the Clayton Act, 38 Stat. 734, 15 U. S. C. § 20 (1964 ed.) (requiring competitive bidding for certain transactions between a common carrier and other corporations when there are common directors), *United States* v. *Boston & M. R. Co.,* 380 U. S. 157; § 16 (b) of the Securities Exchange Act of 1934, 48 Stat. 896, 15 U. S. C. § 78p (b) (1964 ed.) (providing that profits made by directors, officers, and principal shareholders through short-swing transactions in corporation stock shall inure to benefit of corpora-

flict-of-interest provision in Art. I, § 6, cl. 2, which prohibits any Congressman from simultaneously holding office under the United States. If the Court would save the conflict-of-interest statutes, which apparently it would, it is difficult to understand why § 504 is stricken down as a bill of attainder.

Other legislative enactments relevant here are those statutes disqualifying felons from occupying certain positions. The leading case is *Hawker v. New York,* 170 U. S. 189, which upheld a provision prohibiting convicted felons from practicing medicine against a claim that, as applied to one convicted before its enactment, it was an *ex post facto* law. The Court noted that a legislature may establish qualifications for the practice of medicine, and character may be such a qualification. Conviction of a felony, the Court reasoned, may be evidence of character:

> "It is not open to doubt that the commission of crime . . . has some relation to the question of character. It is not, as a rule, the good people who commit crime. When the legislature declares that whoever has violated the criminal laws of the State shall be deemed lacking in good moral character it is not laying down an arbitrary or fanciful rule—one having no relation to the subject-matter, but is only appealing to a well recognized fact of human experience . . . .

.     .     .     .     .

> "It is no answer to say that this test of character is not in all cases absolutely certain, and that sometimes it works harshly. Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind

---

tion), *Blau v. Lehman,* 368 U. S. 403, 411–413; § 310 (b) of the Trust Indenture Act of 1939, 53 Stat. 1157 (making certain conflicting interests grounds for disqualification of indenture trustees).

to make a rule of universal application, and no inquiry is permissible back of the rule to ascertain whether the fact of which the rule is made the absolute test does or does not exist." 170 U. S., at 196–197.

Accord, *De Veau* v. *Braisted,* 363 U. S. 144, 159–160 (Frankfurter, J., announcing judgment) (bill of attainder and *ex post facto* challenges).

Like § 504, the legislation challenged in *Hawker* was both overinclusive and underinclusive. Felons were not the only persons who might possess character defects making them unsuitable practitioners of medicine; and, as the Court expressly noted, not all felons would lack good moral character. Nevertheless, the legislature was permitted to disqualify all members of the class, rather than being required to delegate to the courts the responsibility of determining the character of each individual based on all relevant facts, including the prior conviction. The legislative findings that sustained the legislation attacked in *Hawker* were simply that a substantial number of felons would be likely to abuse the practice of medicine because of their bad character. It is just such findings respecting the average propensities of a given class of persons to engage in particular conduct that the Court will not now permit under the Bill of Attainder Clause. Though the Court makes no attempt to distinguish the *Hawker*-type laws it apparently would save them, see *Trop* v. *Dulles,* 356 U. S. 86, 96–97 (WARREN, C. J., announcing judgment), and with them the provision of the statute now before the Court which disqualifies felons from holding union office.[3]

_____

[3] For a partial listing of similar statutes, see *De Veau* v. *Braisted,* 363 U. S. 144, 159 (Frankfurter, J., announcing judgment). *De Veau* v. *Braisted* itself sustained against a bill of attainder challenge, without dissent on this issue, a state statute disqualifying felons from holding office in waterfront labor unions.

The Court apparently agrees that the Subversive Activities Control Act was not a bill of attainder with regard to the Communist Party because, as the Court pointed out in *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, the finding that the Party was a Communist-action organization was not made by the legislature but was made administratively, after a trial-type hearing and subject to judicial review. But this apparently does not settle whether the statute is a bill of attainder with respect to Party members; for under today's approach, a finding about the Party and about some of its members does not cure the vice of overinclusiveness. The Subversive Activities Control Act attaches certain disqualifications to each Party member following the administrative-judicial finding that the Party is a Communist-action organization. Among other things, each Party member is disqualified from holding union office, almost the same disqualification as is involved here. Subversive Activities Control Act of 1950, § 5 (a)(1)(E), added by the Act of Aug. 24, 1954, § 6, 68 Stat. 777, 50 U. S. C. § 784 (a)(1)(E) (1958 ed.). I do not see how this and the other consequences attached to Party membership in that Act could survive examination under the principles announced today.

On the other hand, if the statutes involved in *Hawker* and *Agnew* are not bills of attainder, how can the Subversive Activities Control Act be an attainder with respect to members of the Communist Party? In the *Communist Party* case, the Board found that the "[Party's] principal leaders and a substantial number of its members are subject to and recognize the disciplinary power of the Soviet Union and its representatives. This evidences domination and control over [the Party] by the Soviet Union, and a purpose to advance the objectives of the world Communist movement." Modified Report of the Board, December 18, 1956, in Record in that case,

p. 2538. That finding was expressly sustained by this Court. 367 U. S. 1, 57. Certainly, if *Hawker* and *Agnew* are to be followed at all, these nonlegislative findings establish a sufficient probability or likelihood with regard to Party members—a sufficient temptation to Party members who are also union officers—to permit the legislature to disqualify Party members from union office as it did in the Subversive Activities Control Act.

And if the disqualification of Party members in the Subversive Activities Control Act is not a bill of attainder, neither is § 504. If it is § 504's specific designation of the Communist Party and its members which concerns the Court—if the Court would have the same concern if the statute in *Agnew* had disqualified the members of a particular underwriting firm—it seems to me that at this point this vice is no vice at all; for the Congress has provided in another statute, the Subversive Activities Control Act, for an adjudication about Communist-action organizations, the nature of the Party has now been adjudicated and an adequate probability about the future conduct of its members established to justify the disqualification which Congress has imposed. Compare *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 244 (absent findings respecting nature of Communist Party at time of bar applicant's membership, membership in Party 15 years prior to application provides no rational ground for disqualification).

This, of course, is not the path the Court follows. Section 504 is said to impose punishment on specific individuals because it has disqualified all Communist Party members without providing for a judicial determination as to each member that he will call a political strike. A likelihood of doing so based on membership is not enough. By the same token, a statute disqualifying Communists (or authorizing the Executive Branch to do so) from holding sensitive positions in the Government would be auto-

matically infirm, as would a requirement that employees of the Central Intelligence Agency or the National Security Agency disclaim membership in the Communist Party, unless in each case it is proved by evidence other than membership in the Communist Party, the nature of which has already been adjudicated, that the individual would commit acts of disloyalty or subordinate his official undertakings to the interests of the Party.

But how does one prove that a person would be disloyal? The Communist Party's illegal purpose and its domination by a foreign power have already been adjudicated, both administratively and judicially. If this does not in itself provide a sufficient probability with respect to the individual who persists in remaining a member of the Party, or if a probability is in any event insufficient, what evidence with regard to the individual will be sufficient to disqualify him? If he must be apprehended in the act of calling one political strike or in one act of disloyalty before steps can be taken to exclude him from office, there is little or nothing left of the preventive or prophylactic function of § 504 or of the statutes such as the Court had before it in *Hawker* and *Agnew*.

Examples of statutes that will now be suspect because of the Court's opinion but were, until today, unanimously accepted as legitimate exercises of legislative power could easily be multiplied. Such a catalogue in itself would lead one to inquire whether the Court's reasoning does not contain some flaw that explains such perverse results.

## II.

One might well begin by challenging the Court's premise that the Bill of Attainder Clause was intended to provide a general dividing line between legislative and judicial functions and thereby to operate as the chief means of implementing the separation of powers. While it must be conceded that our system of government is

based on the separation of powers and that the prohibition on bills of attainder is a judicially enforceable restraint on legislative power and therefore constitutes one among the many mechanisms implementing the separation of powers, that conclusion is the most that can be gleaned from the authorities cited by the Court. Some, like the statement quoted from Chief Justice Marshall, *Fletcher* v. *Peck,* 6 Cranch 87, 136, reflect views concerning "whether the nature of society and of government does not prescribe some limits to the legislative power," *id.,* at 135, rather than an analysis of the bill-of-attainder provision. None assigns a pre-eminent position to that provision as compared with other restraints on the legislature.

On the other hand, there are substantial reasons for concluding that the Bill of Attainder Clause may not be regarded as enshrining any general rule distinguishing between the legislative and judicial functions. Congress may pass legislation affecting specific persons in the form of private bills. It may also punish persons who commit contempt before it. So too, one may note that if Art. I, § 9, cl. 3, immortalizes some 'notion of the separation of powers at the federal level, then Art. I, § 10, necessarily does the same for the States. But it has long been recognized by this Court that "[w]hether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the State." *Dreyer* v. *Illinois,* 187 U. S. 71, 84; accord, *e. g., Reetz* v. *Michigan,* 188 U. S. 505, 507; *Carfer* v. *Caldwell,* 200 U. S. 293, 297; *Sweezy* v. *New Hampshire,* 354 U. S. 234, 255 (WARREN, C. J., announcing judgment), 256–257 (Frankfurter, J., concurring), 268 (CLARK, J., dissenting).

## III.

The basic flaw in the Court's reasoning, however, is its too narrow view of the legislative process. The Court is concerned to separate the legislative and judicial functions by ensuring that the legislature does not infringe the judicial function of applying general rules to specific circumstances. Congress is held to have violated the Bill of Attainder Clause here because, on the one hand, § 504 does not encompass the whole class of persons having characteristics that would make them likely to call political strikes and, on the other hand, § 504 does single out a particular group, members of the Communist Party, not all of whom possess such characteristics. Because of this combination of underinclusiveness and overinclusiveness the Court concludes that Communist Party members were singled out for punishment, thus rejecting the Government's contention that § 504 has solely a regulatory aim.

The Court's conclusion that a statute which is both underinclusive and overinclusive must be deemed to have been adopted with a punitive purpose assumes that legislatures normally deal with broad categories and attack all of an evil at a time. Or if partial measures are undertaken, a legislature singles out a particular group for regulation only because the group label is a "shorthand phrase" for traits that are characteristic of the broader evil. But this Court has long recognized in equal protection cases that a legislature may prefer to deal with only part of an evil. See, e. g., Railway Express Agency, Inc. v. New York, 336 U. S. 106; Semler v. Oregon State Board of Dental Examiners, 294 U. S. 608; Bryant v. Zimmerman, 278 U. S. 63; Patsone v. Pennsylvania, 232 U. S. 138. And it is equally true that a group may be singled out for regulation without any punitive purpose even when not all members of the group would be likely to engage in the feared conduct. "[I]f the class discrimi-

nated against is or reasonably might be considered to define those from whom the evil *mainly is to be feared,* it properly may be picked out." *Patsone* v. *Pennsylvania,* 232 U. S., at 144. (Emphasis added.) That is, the focus of legislative attention may be the substantially greater likelihood that some members of the group would engage in the feared conduct compared to the likelihood that members of other groups would do so. This is true because legislators seldom deal with abstractions but with concrete situations and the regulation of specific abuses. Thus many regulatory measures are enacted after investigation into particular incidents or the practices of particular groups and after findings by the legislature that the practices disclosed are inimical to the public interest and should be prevented in the future. Not surprisingly, the resulting legislation may reflect in its specificity the specificity of the preceding legislative inquiry. See *United States* v. *Boston & M. R. Co.,* 380 U. S. 157, 161–162. But the fact that it does should not be taken, in itself, to be conclusive that the legislature's purpose is punitive. Admittedly the degree of specificity is a relevant factor—as when individuals are singled out by name—but because in many instances specificity of the degree here held impermissible may be wholly consistent with a regulatory, rather than a punitive purpose, the Court's *per se* approach cuts too broadly and invalidates legitimate legislative activity.

## IV.

Putting aside the Court's *per se* approach based on the nature of the classification specified by the legislation, we must still test § 504 against the traditional definition of the bill of attainder as legislative punishment of particular individuals. In my view, § 504 does not impose punishment and is not a bill of attainder.

We have said that "only the clearest proof could suffice" to establish that Congress' purpose was punitive rather than regulatory. *Flemming* v. *Nestor,* 363 U. S. 603, 617. A punitive purpose has been found when it could be said that a statute passed amid the fierce passions aroused by the Civil War bore no rational connection to any permissible legislative purpose. *Cummings* v. *Missouri,* 4 Wall. 277, 319, 322; see *Dent* v. *West Virginia,* 129 U. S. 114, 128; *Hawker* v. *New York,* 170 U. S. 189, 198. The imposition of a particularly harsh deprivation without any discernible legitimate legislative purpose has similarly been characterized as penal. *Trop* v. *Dulles,* 356 U. S. 86 (WARREN, C. J., announcing judgment). Similarly a punitive purpose has been found when such a purpose clearly appeared in the legislative history. *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 169; *United States* v. *Lovett,* 328 U. S. 303, 308–314. In other cases the analysis is more difficult. We summarized the relevant considerations in *Kennedy* v. *Mendoza-Martinez, supra:*

> "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment— retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions." 372 U. S., at 168–169.

An application of these criteria to § 504 compels the conclusion that it is regulatory rather than punitive.

Congress' concern with the possibility of political strikes is not simply a fictional concern advanced to mask a puni-

tive purpose. Congress has sought to forestall political strikes since 1947, when it adopted § 9 (h) of the National Labor Relations Act, which was sustained as a reasonable regulation in *American Communications Assn.* v. *Douds,* 339 U. S. 382. Section 504 was adopted as a fairer and more effective method of dealing with the same evil. H. R. Rep. No. 741, 86th Cong., 1st Sess. (1959), p. 33; 1 Leg. Hist. LMRDA 791. Section 9 (h) had proved ineffective because many Communists would take the prescribed oath, which meant the only sanction available was a perjury prosecution that presented serious difficulties of proof. See Hearings before the House Committee on Un-American Activities, Communist Infiltration of Vital Industries and Current Communist Techniques in the Chicago, Illinois, Area, 86th Cong., 1st Sess. (1959), pp. 519, 576; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare, Communist Domination of Unions and National Security, 82d Cong., 2d Sess. (1952), p. 54. Moreover, the oath requirement created inequities both because the disqualification imposed was visited on the whole union membership and because the taking of an oath was exacted of all union leaders, many of whom resented the requirement. See *American Communications Assn.* v. *Douds,* 339 U. S., at 434–435 (Jackson, J., concurring and dissenting); S. Rep. No. 187, 86th Cong., 1st Sess. (1959), pp. 7, 9; 1 Leg. Hist. LMRDA 403, 405. It was obviously reasonable for Congress to substitute § 504 for § 9 (h), and no punitive purpose may be inferred from such congressional action.

Nor can it be denied that § 504 is reasonably related to a permissible legislative objective. In *American Communications Assn.* v. *Douds,* we held that "Congress could rationally find that the Communist Party is not like other political parties in its utilization of positions of union leadership as means by which to bring about strikes . . . ," 339 U. S., at 391, and therefore Congress could rationally

infer that members of the Communist Party were likely to call political strikes. See also *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, 93–94, 112. In 1956 the Subversive Activities Control Board found, after a trial-type hearing, that the Party's principal leaders and a substantial number of its members recognize the disciplinary power of the Soviet Union. Without question the findings previously made by Congress and the Subversive Activities Control Board afforded a rational basis in 1959 for Congress to conclude that Communists were likely to call political strikes, and sufficiently more likely than others to do so that special measures could appropriately be enacted to deal with the particular threat posed.

In view of Congress' demonstrated concern in preventing future conduct—political strikes—and the reasonableness of the means adopted to that end, I cannot conclude that § 504 had a punitive purpose or that it constitutes a bill of attainder. I intimate no opinion on the issues that the Court does not reach.